1  Peter J. Ferguson, SBN 108297
   Allen Christiansen, SBN 263651
2  **FERGUSON, PRAET & SHERMAN**
   A Professional Corporation
3  1631 East 18th Street
   Santa Ana, California  92705
4  (714) 953-5300 telephone
   (714) 953-1143 facsimile
5  Peterferg@aol.com

6

7  Attorneys for Defendants City of Fresno, Tomas Cantu and Curt Chastain

8  Kevin M. Osterberg, SBN138760
   Kosterberg@hbblaw.com
   **HAIGHT, BROWN & BONESTEEL, LLP**
9  3750 University Ave., Suite 560
   Riverside, CA 92501
10 (951) 341-8300; Fax (951) 8309

11

12 Attorneys for Defendant Derik Kumagai

13

14

15                 UNITED STATES DISTRICT COURT

16              EASTERN DISTRICT OF CALIFORNIA

17

18 MICAH JESSOP and BRITTAN ASHJIAN,)   NO.  1:15-cv-00316 DAD-SAB
                                     )
19                                   )   [Honorable Dale A. Drozd]
                Plaintiffs,          )
20                                   )   **DEFENDANTS**
         vs.                         )   **MEMORANDUM OF POINTS**
21                                   )   **AND AUTHORITIES IN**
                                     )   **SUPPORT OF MOTION FOR**
22 CITY OF FRESNO, et al.,           )   **SUMMARY JUDGMENT**
                                     )
23                                   )
                                     )   Date: January 17, 2016
24                                   )   Time: 9:30 am
                                     )   Courtroom:  5, 7th Floor
25              Defendants.          )
   _____)

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiffs were operating a legal ATM business ("ATM On-Line Services") in and around the City of Fresno.  They were also operating machines known as "coin pushers" generally alongside the ATM machines.  Coin Pusher machines are illegal to operate in California pursuant to *California Penal Code* Sections 330a, 330b and 330.1.  In early 2013 the Fresno Police Department, through their Vice Unit, obtained information from an agent with the California Department of Alcohol and Beverage Control regarding coin pushers in the Fresno area and began an investigation of the illegal machines.  It was during this investigation that Detective Kumagai learned of the operation of the ATM and coin machines by plaintiffs Micah Jessop and Brittan Ashjian.  Also during the investigation evidence of possible money laundering was also discovered.  In that regard, money obtained from the coin pushers was being converted to cash at banks used by the Plaintiffs in their ATM business.

Eventually, the investigation culminated into search warrants being issued and then served simultaneously at three locations: Jessop's house, Ashjian's house and the ATM business location.  At the search warrant locations, among other things, coin pusher machines and monies were seized.  Evidence logs of the seized property were kept.  The money was recounted at the police station with at least two persons present and then transported and inventoried at the police property location.

During the search, it was discovered that some paper monies and coins appeared to be a collectible type that was unrelated to the investigation.  Although the search warrants specifically authorized the collection of "all" money, some of the money did not appear relevant to the case.  Searching officers confirmed with Lead Detective Kumagai as well as Supervising Detective Sgt. Chastain that they

were not to take the "collectible monies."  Indeed, after confirming with

supervises not to take the money, Detective Reynolds specifically placed these

collectibles in a suitcase and they were left at the house after the search warrant

service.  Later some additional coins, a tube of silver dollars and other loose coins,

were also returned to the plaintiffs.  Indeed, ten boxes of seized materials were

eventually returned back to the plaintiffs.

Plaintiffs did complain about the possibility of missing money along with

their attorneys.  They met with the police several times and eventually were

allowed to look at the seized property at the police department.  It was at that

meeting, in learning of possible criminal charges being filed, plaintiffs agreed to

enter into a confidential informant contract with the City.  This was entered into

by plaintiffs after consultation with their attorneys whereby no criminal charges

would be filed with the District Attorney's office in exchange for their help in

locating additional illegal machines and other information concerning the

distribution and manufacturing of the illegal machines.  Importantly, the

agreement also provided that the plaintiffs were each agreeing that $50,000

obtained from the search warrants was to be confiscated by the City.

The plaintiffs did file California Tort Claims with the City.  The Claims

were rejected but plaintiffs did not file a lawsuit in state court.  This Federal action

was filed on 2/26/2015, well after the state statute of limitations had run on their

tort claims.  Here, plaintiffs have dismissed all the named defendants with the

exception of Detective Kumagai, Detective Cantu and Detective Chastain.

All claims must also be dismissed.  Plaintiff First cause of Action for illegal

search and seizure alleges that "the theft of currency and coins was unreasonable

and unjustified."  This claim fails as the searches were made pursuant to a valid

search warrant issued by a neutral and detached judge.  Moreover, lost or stolen

items from a search are best resolved by way of a post deprivation remedy.  This

remedy is stated in their Second cause of Action for Procedural Due Process. Here, plaintiffs filed government tort claims.  The claims were rejected or returned.  Plaintiffs thus received their procedural due process.  Because they chose not to follow the process all the way through is not relevant.  They had a remedy sufficient for receiving their post procedure due process, and they simply chose not to follow it through.

Moreover, plaintiffs freely entered into a contract with the City.  They agreed to forfeit $50,000 each obtained from the searches.   They thus waived any right to return of any alleged missing money.

Plaintiffs Third cause of action alleges a Substantive Due Process claim. This action fails as the claim, if any, should be analyzed under the Fourth Amendment.  In any regard, there simply are no facts of conduct that would "shock the conscience" sufficient to implicate the Fourteenth Amendment.

Plaintiffs Fourth cause of action alleges a Monell claim.  Here again, there are no facts of an official policy to lose money or items during a search warrant. Regardless, the individual officers are entitled to qualified immunity and must be dismissed.

## II.    STATEMENT OF MATERIAL FACTS

The search warrant affidavit and supporting information regarding the investigation and subsequent searches.

### A.    Detective Kumagai

Detective Kumagai attended the police academy in 2000. (Deposition of Kumagai, pg. 8: 5-7).  He first began investigating the Plaintiffs two or three months after joining the vice unit.  (Id. 18: 17-21) Prior to this investigation, Detective Kumagai investigated other coin pushers. (Id. 21: 2-5) He conducted

1    approximately a dozen or so coin pusher investigations. (Id. 21: 6-7)

2        Detective Kumagai was the lead investigator on this investigation. He found

3    out about a location and ended up getting a card with Mr. Ashjian's contact

4    information on it. (Id. 25: 25-26: 5) Detective Kumagai then conducted numerous

5    surveillance on Mr. Ashjian. (Id. 27: 18-20)

6        On September 9, 2013, Detective Kumagai authored a search warrant signed

7    by Judge Chittick. (Id. 39: 4-6) He applied for a search warrant that included

8    searches of specific locations and vehicles. (Id. 41: 17-19) Prior to the execution

9    of the search warrant, Detective Kumagai conducted a briefing. (Id. 42: 5-7) The

10   briefing was held at the Special Investigations Bureau on McKinley Avenue. (Id.

11   42: 8-10) The Vice Intel Unit, the Major Narcs Unit, the Violent Crimes Impact

12   Team and Financial Crimes were all present for the briefing. (Id. 42: 11-14).

13       Sergeant Curt Chastain, Detective Tomas Cantu, Special Agent Gene Pinon,

14   District Attorney Mike Brummel, Detective Ken Dodd and Detective Mario

15   Lucero all accompanied Detective Kumagai at the Simpson (Business)  address.

16   (Id. 43: 22-44: 2)

17       When they went to the location an employee for the business was there. (Id.

18   44: 14-19) The business is ATM On-Line Services. (Id. 44: 20-21) Once the

19   location was secured, Detective Kumagai began speaking with the female

20   employee. (Id. 45: 18-20) He also made contact with Mr. Jessop. (Id. 46: 18-20)

21   Detective Kumagai and Mr. Jessop went into the kitchen area of the residence

22   where Detective Kumagai advised him of why he was there. (Id. 46: 23-47: 2) Mr.

23   Jessop waived his *Miranda* rights. (Id. 47: 3-4) He questioned Mr. Jessop about

24   his interest and the manner in which the ATM business was conducted alongside

25   the coin pushers.  Mr. Jessop advised him that he had an agreement with Mr.

26   Ashjian about operating the machines and splitting the proceeds.  (Id. 19-49: 3)

27   Detective Kumagai asked Mr. Jessop if he knew the machines were illegal and he

28   was told by Mr. Jessop that he had an idea that they were illegal because they were

4

beginning to get seized by law enforcement.  Detective Kumagai asked Mr. Jessop why he didn't contact Fresno Sheriff's office in regard to the coin pusher.  He provided Detective Kumagai the locations of the other coin pushers. (Id. 49: 3-13)

The assisting personnel were cataloging and analyzing the items seized and collected as evidence.  Detective Kumagai was being contacted by assisting case agents at different locations about what needed to be done. (Id. 52: 18-24) At the Simpson address, Detective Dodd, Detective Lucero and Detective Cantu were telling Detective Kumagai the locations where evidence was located. (Id. 54: 9-12) Detective Cantu was keeping track of this information.  (Id. 54: 13-15) Detective Cantu was making a property list. (Id. 54: 16-17)  Detective Kumagai was not present when the money was counted. (Id. 54-18-20) The money was counted at the Simpson location.  (Id. 55: 2-4) Property Evidence Reports were provided to Detective Kumagai and he left a receipt at that location prior to leaving which had the total amount that was collected. (Id. 55: 5-9) He left the search warrant receipt with Mr. Ashjian and Mr. Jessop. (Id. 69: 1-3) Detective Kumagai saw the money at the Simpson location. (Id. 4-6)

The money that was seized at the Stuart residence was seized prior to Detective Kumagai's arrival.  Assisting personnel had counted it. (Id. 75: 11-18) He did not see how the money was packaged at the Stuart location. (Id. 75: 19-21) He was previously advised by telephone by Detective Arellanes about the "collectible" money. (Id. 2-3)  Detective Kumagai advised Detective Arellanes to leave the collectible coins at residence. (Id. 83: 4-14) Approximately $50,000 was seized from both locations. (Id. 87: 9-18) The $50,000 was seized as it was currency that was likely connected to the investigation of money laundering and operation of illegal coin pusher machines. (Id. 87: 20-23) Detective Kumagai believed the $50,000 was connected with the investigation of money laundering as there was evidence of  commingling of funds with a legitimate business and attempts to clean up the money from the operation of the illegal machines. (Id. 89:

7-12) Detective Kumagai through his investigation learned that the suspects were using a business account to convert the coin currency into bill currency.  Once that is converted, it's commingled, thus there's no determining on what would be considered clean money or dirty money. (Id. 90: 13-91: 6) After the search the bank personnel advised Detective Kumagai that the Plaintiffs were converting coins two to three times a week in the amount of $500 each time.  (Id. 91: 21-24)

## B.   Curt Chastain

He has been a Fresno police officer for approximately 30 years.  (Deposition of Chastain, page 5, line 15).  He is and was at the time of the incident a supervising sergeant of the Vice Criminal Intelligence Unit.  (Id. 5:16-22) This case came forward though normal proactive work in the gaming area.  There had been a big influx of illegal gaming machines in the city.  (Id. 6:7-21), (See Declaration of Chastain, para. 2-3).

Detective Kumagai came up with a lead that potentially led to a target of who was distributing these machines, thus the investigation began.  Detective Chastain was not involved in developing a surveillance plan but showed oversight of it.  He would receive verbal updates and, when necessary, did involve himself with some of the surveillance. (Id. 8:9-16), (Chastain decl. para. 3).

He became aware and  highly suspected that Ashjian and Jessop where definitely a distributor of the machines. (Id. 10:1-4), (Chastain decl. Para. 4).  This organization operated ATM machines and the illegal gambling machines that were located together at some of the locations and were both serviced by Jessop and Ashjian. (Chastain, decl. para. 4).

He also became aware that the quarter coins collected from the illegal gambling machines were eventually exchanged for cash monies to the Banks where the ATM business did its banking.  This led him to believe that the monies received from the illegal business was being commingled with legitimate monies as a way to hide illegal proceeds.  This evidences a clear illegal purpose to

6

1   Launder money in possible violation of Penal Code section 186.10.  At the very

2   least a conspiracy to do so is evident from the actions stated. (Chastain decl, para

3   5).

4           He had reviewed the briefing sheet prior to the briefing and had made

5   contact with other units that were going to assist in the service of the warrants.  He

6   eventually went to the Simpson Street address and was on the initial team that

7   served the search warrant and stayed in contact with the other locations to see if

8   they were secure, and that the searches were going to start. (Id. 10:19-24)

9   (Chastain decl., para. 7).

10          At the location he was aware that money was found in the kitchen area and

11  in a Dodge truck belonging to Mr. Jessop parked in the driveway. (Id. 21:19-22:4)

12          He was present when money was found in the Dodge truck and counted.

13  (Id. 22:10-20)  He did play a  supervisor role to stand there and see what kind of

14  amounts were found and to ensure that there was a witness to it and see that it was

15  being done correctly.  (Id. 22:21-15) (Chastain decl., para. 8).

16          He did verify the operation working on the monetary amounts and show

17  control over it to ensure that it was being handled. And that the next day to see

18  when it was counted again prior to it being taken down into the property room.  He

19  was active throughout the day to see what monies were being taken.  (Id. 23:9-22)

20  In addition to what Detective Cantu wrote down as the scribe in the property log

21  he kept mental notes about the quantity of the amount that was located.  (Id.

22  23:23-24:3)  He was the person that actually transported the money from the scene

23  to the station.  (Id. 24:4-7) (Chastain decl., para.  9).

24          When he left the Simpson location he went to the Stuart location and had

25  taken the money with him.  (Id. 24:13-15)   He made the decision that he would be

26  the one to keep the monies and locked it up in his vehicle. (Id. 24:21-23) And he also

27  played a role in verifying that the same amount of money reached the station. (Id.

28  25:10-13) And once the money was counted it was put on the receipt that was

7

given to Mr. Jessop. (Id. 25:20-24)

When the money was recounted back at the station, the tally was consistent with the evidence logs collected at the particular location.  (Id. 37:9-13) While at the Simpson location he had received a call from Sgt. Reynolds and he talked with Detective Arellanes that they had a question regarding collectibles. And he said that was not something that we wanted to take possession of; it wasn't part of this investigation and to leave those items. (Id. 35:16-15) Jessop later made an allegation that he's missing some collectible items and he assured Jessop that there was a protocol for those investigations and that he informed Jessop that he could come down and look at all the monies collected and the properties received and if there was collectible items in there then they would be returned to them because it wasn't our intention to do that.  ((Id. 36:2-10)

Later they did go to the property room, where Det. Chastain was present and they viewed the property and no one said there was more money seized than what was shown.  (Id. 36:21-37:3) He is also aware that Mr. Jessop and Mr. Ashjian voluntarily entered into contracts with the City to become confidential informants in exchange for the City not submitting the case to the District Attorneys Office. Plaintiffs also agreed to forfeit $50,000 collected in the searches.  (Chastain decl. Para 11).

He is not aware of any theft of property including money found at the search locations. (Chastain decl. Para. 10).

When someone comes into the Vice Unit, Sgt Chastain wants to ensure that the potential person is a trustworthy and reliable person.  He did inquire of present and past supervisors with knowledge of Kumagai in doing his background check and well as his current and past assignments and training.  Sgt Chastain concluded that he had was a trustworthy and reliable person. (Id. 11:14- 14:15)  Only after the search warrant did he become aware of a federal investigation that concerned him regarding his financial connection with certain known drug dealers.  (Id.

1    15:18-21)

2

3        **C.    Tomas Cantu**

4            Detective Cantu has been with the Fresno Police Department for

5    sixteen years. (Deposition of Tomas Cantu, pg. 7: 2-3) They were investigating

6    illegal coin pushers, illegal gambling devices and the investigation led them to

7    Micah Jessop. (Id. 9: 6-11) Prior to the Ashjian/Jessop investigation, Detective

8    Cantu was on the vice unit for approximately a year and a half. (Id. 9: 23-10: 1)

9    Detective Cantu became aware of Mr. Jessop and Mr. Ashjian through Detective

10   Kumagai.  (Id. 12: 21-25)

11           Detective Cantu was assigned the "Simpson" residence. (Id. 27: 2-4) He was

12   the Detective with the job of scribe. (Id. 27: 8-10) Detective Cantu was to be

13   notified of the evidence, collect it, document it, and keep possession of it until it's

14   turned over to the person who's going to book it and transport it. (Id. 27: 11-18)

15   He did not count the money but was present while it was being counted. (Id. 31:

16   20-22) The scribe takes the money, is present when the money is being counted, or

17   counts the money himself.  He also makes sure that both officers present agree on

18   what is being counted.  (Id. 32: 7-16) The money found stayed with Sergeant

19   Chastain. (Id. 40: 5-8) Sergeant Chastain transported all the money back to the

20   station. (Id. 47: 11-14)

21

22       **D.    Robert Reynolds**

23           Detective Kumagai was the lead investigator in the case. (Deposition

24   of Robert Reynolds, pg. 8: 3-5) The briefing sheet had assignments, locations and

25   teams. (Id. 8: 14-16) Detective Reynolds was assigned to the Stuart residence. (Id.

26   8: 17-18) Detective Reynolds did not contact Detective Kumagai after he located

27   coins wrapped in the binders.  (Id. 29: 25-30: 8) Detective Reynolds contacted

28   Sergeant Chastain after he found coins wrapped in binders. (Id. 30: 9-14) The

9

officers discussed if the coins should be included as part of the search warrant. (Id. 30: 15-19) The officers decided that the coins were collectibles and not coins that would be coming out of a coin pusher machine.  (Id. 30: 20-31: 5) Detective Reynolds advised Detective Arnellanes that they were not going to take coins and Detective Arnellanes took the collectible coins off the inventory sheet. (Id. 31-12-17) The coins were then placed in a suitcase in the master bedroom outside the closet. (Id. 32: 9-16) The collectible coins were in the suitcase when Detective Reynolds left the premises. (Id. 32: 17-19) Detective Reynolds saw Detective Arnellanes cross off the coins on the inventory sheet. (Id. 32: 25-33: 2) The coins had been found inside a gray tote.  (Id. 33: 7-9) The coins were not placed back in the gray tote.  They were placed in the suitcase.  (Id. 33: 11-16)

### E.    Ken Dodd

Detective Dodd has been with Fresno Police Department for over 20 years. (Deposition of Dodd, pg. 5: 14-15) He was part of the Financial Crimes Unit and was contacted by Detective Kumagai about the investigation of Mr. Jessop and Mr. Ashjian.  (Id. 6: 1-6) He was assigned to the "Simpson" residence. (Id. 6: 23-24: 2) Detective Dodd found money in the Dodge truck that pulled up. (Id. 8: 5-8) He also found money in the back seat and a drawer in the desk inside the home. (Id. 9-12)

He counted the money that he found in the truck (Id. 9:1-5) He had Detective Cantu on his left and Sergeant Chastain on my right side when counting the money. (9:6-11) After the search and counting of monies he left. (14:17-21)

### F.    Annette Arellanes

Detective Arellanes has been with Fresno Police Department for Twenty-one years. (Deposition of Arellanes, pg. 5: 18-20) She was part of the team of officers assigned to the "Stuart"  residence. (Id. 8: 4-13) A majority of the money was found in the master bedroom closet. (Id. 14: 2-6) She observed collectible coins but they were not seized. (Id. 14: 18-21) Originally Detective Arellanes was

10

going to seize the collectible coins and wrote them down on the property form. She called the case  agent and Sergeant Chastain and they decided not to collect the collectible coins and therefore they were crossed off.  (Id. 14: 22-15: 4) When Detective Kumagai arrived at the location, the officers were done with their search and the property they were taking was located in the living room. (Id. 15: 13-17)

## G.    Brittan Ashjian

When the search warrants were served he was not handcuffed nor placed under arrest. (deposition of Ashjian, 135:24-136:24).  There had been concern that criminal charges might be filed against him. (Id. 84:22-15).  Afterwards, he entered into a contract with the City of Fresno. (Id., 108:5-24). Prior to entering into the agreement he received legal advice and agreed to the terms of the contract. (Id. 109:3-5, 10-12).  He agreed that by entering into the contract he was to allow $50,000 to be forfeited to the City. (Id.114:23-115:2).

After the search, property was returned back but a computer had been accidentally broken. (Id. 134:20-135:16).   He did file a tort claim with the City for the broken computer and was paid for the damage. (Id. 132:24-133:14).

He knew he had cash in his vehicle the day of the search but did not know how much (Id. 64:8-9).  His house was searched.  $400 dollars in cash was collected in the search and was returned back to him. (Id. 80:7-15).

## G.    Micah Jessop

He claims that he had collectible coins, that were in a rubber tub like container, before the search.  (Deposition, Vol. I, 137:5-9).  He has not had the coins appraised (Id., 137:24-138:2).  He did search a suit case after the search and found some collectible items. (Id. 144:2-10).   He is claiming some of the collectible coins were in the suitcase but not all of the collectible coins. (Id. 141::11-19).  He also received back from the police department silver coins (Id.

11

146:1-9) a bag with coins in it and a container with a coin in it (Id. 147:20-148:6) and was returned a  sleeve of silver dollars (Id. 148:11-19).   Ten boxes were eventually received back from the police department where some of the collectible coins were found.  (Id. 150:11-15).

After the search, a meeting with Jessop, Ashjian, their attorney's and members of the police department occurred (Id. 153:23-154:5-8).  Jessop did mention during the meeting that cash and coins were missing. (Id. 155:5-7).  He asked Detective Kumagai "that there was a little tub that had all of my coins and gold certificates in it and uncirculated bills and I asked them if they had taken it and they said no." (Id. 155:18-23).  Detective Kumagai informed him that the collectible were all placed in a suitcase on the floor in the master bedroom. (Id. 157:4-10).

His attorney made a request to see the property that was seized (Id. 160:23-161:5). He did go to the department to view the property that was on a cart.  (Id. 162:1-11).  He did see "paper currency, some coins, quarters, rolls of quarters. Inside the bag there were uncirculated bills" (163:4-6).  He said this was not all the money. (Id. 163:13-14).  Detective Kumagai "shrugged his shoulders and said he didn't know what to tell me." (Id. 163:17-25).   "He [detective Kumagai] said that we could file a claim with the city". (Id. 166:11-13).

Jessop did enter into a contract with the City to be a confidential informant and that he would be personally forfeiting $50,000. (Vol. II, 17:16-18:1).   After Kumagai's  arrest , he did speak with the DEA and FBI about the search warrant. (Vol I, 184:9-12).  Jessop did not blame Detective Kumagai or state that he thought Kumagai personally took money and collectible coins.  He stated, "I did say the Fresno Police Department" did. (Id. 183:15-22) .  He did not see nor know of a specific officer that took money and collectibles.  He only concludes that, "I don't know what has happened behind closed doors"(Id.193:2-6).

He did file a claim or claims with the City of Fresno. (Id. 198:12-14).

## III.   LEGAL CLAIMS

### A.   First Cause of Action

Plaintiffs' first cause of action alleges an unlawful seizure and theft of currency deprived Plaintiffs of their right to be secure in their homes or business against unreasonable searches and seizures as guaranteed to Plaintiffs under the Fourth Amendment.  (Complaint, page 8-9, paragraph 31).  The Claim is against all the defendants except the City.  First, the Searches were carried out by a valid search warrant signed by a judge.  (See declaration of Kumagai, exhibit 1, signed warrant and attached affidavit in support thereto.)

The searches were conducted pursuant to a valid search warrant. "Where the alleged *Fourth Amendment* violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in 'objective good faith.'" *United States v. Leon*, 468 U.S. 897, 922-923, 104 S.Ct. 3405(1984).  Here, the warrant was supported by probable cause that the plaintiffs were conducting a business involving illegal "coin pushers."  It is not disputed that plaintiffs had in their possession and control the Coin Pushers located in the Fresno area.  Clearly, this is in violation of California Penal Code section 330a and 330b.  It is equally clear, that the coin pushers were placed at locations where the plaintiffs' ATM machines were located.  Further, that the coins were turned into paper money at the banks where the ATM business did business.  The real possibility of money laundering or conspiracy to conduct money laundering was occurring.  In the end, Defendants are entitled to judgment on the First cause of action.

## A.    Second Cause of Action

The second cause of action alleges a purported violation of a deprivation of procedural due process.  The Claim is against all the defendants except the City. Here it is alleged that "the theft of the currency and coins was unlawful and unjustified, and Plaintiffs were provided with no means of redress or procedure whereby they could dispute said deprivation"  (Complaint, para. 36).

"The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L. Ed. 2d 433 (1979) (quoting 42 U.S.C. § 1983). "*Section 1983* imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker,* 443 U.S. at 146, 99 S.Ct. at 2695.

"The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished 'without due process of law.'" *Baker, 443 U.S. at 145, 99 S.Ct. at 2695.*

Plaintiffs were, however, provided a post deprivation remedy.  And they both acknowledge that they had filed a tort claim.  Indeed, both did. (see        ). In *Collins v Guerin* 2014 U.S. Dist. Lexis 174435, a police officer executed a search warrant at a jewelry store.  Plaintiff alleged that a safe in the back was ordered opened and he was ordered to leave the room thereby leaving the officer alone in the back with the open safe.  Plaintiff then alleged that there was no reference in the Receipt and Inventory listing of the items officially seized, and he discovered the next day a 5.05 carat ruby and 69 ounces of gold missing from the safe.  He then alleged that the items were converted by the officer.  He later filed an action under 42 U.S.C. 1983 claiming a deprivation of his property without due process of law.

The Court held that to the extent Plaintiff alleges his property was taken without due process of law, the procedural due process claim is barred.  In part, the action is barred by the case of *Parratt v. Taylor*, 451 U.S. 527 (1981), because the actions constituted "random and unauthorized" conduct and any pre-deprivation procedures instituted by the State would have been impractical under the circumstances.  In *Parratt*, the Supreme Court held that "a negligent deprivation of property by state officials does not violate the Fourteenth Amendment if an adequate post-deprivation state remedy exists. Citing *Hudson v. Palmer*, 468 U.S. 517, 519 (1984).  Here then, the filing of a state tort claim and utilization of the state procedures is all that is required.  Thus Plaintiffs second cause of action fails and the defendants are entitled to judgment.

## C.    Third Cause of Action

Plaintiffs are now alleging a Substantive Due Process Claim.  The Claim is against all defendants <u>except the City</u>.  First, Plaintiffs simply do  not have a Fourteenth Amendment claim and, even if they did, it should be analyzed under the Fourth Amendment reasonableness standard here.  See *Teixeira v. County of Alameda*, 2016 U.S. App. LEXIS 8925 at *12 (2016), *Albright v. Oliver*, 510 U.S. 266, 273 (1979) and *Graham v.Connor*, 490 U.S. 386, 395 (1989).

"The concept of 'substantive due process,' semantically awkward as it may be, forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998). The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 1070, 117 L. Ed. 2d 261

(1992).  As a starting point, there is no evidence that Defendants engaged in conscience shocking activity.

Here, Plaintiffs allege that the "theft of the currency and coins was a heinous and intentional abuse of public authority."   But as described above, a search warrant was obtained.  It contains the facts supporting probable cause for its issuance.  Indeed, it was signed by a neutral and detached superior court judge.  Importantly, the searching detectives at the Stuart location found collectible items and in using their own judgement confirmed that, although money and listed in the warrant, it was not relevant to the case and left the items.  Be that as it may, plaintiffs knew they were in deep trouble.  They immediately lawyered up.  They even entered into an agreement to become confidential informants for the benefit of having no criminal charges filed.  They understood the terms and they were represented by Counsel when they signed the agreement.

More importantly, each plaintiff voluntarily forfeited $50,000 in exchange for entering into the agreement thus avoiding criminal charges.  And be that as it may, ten boxes of items, including some items they said were missing, were returned. (See,    ).  In fact, a computer had been accidently broken when it was in the process of being returned.  Mr. Ashjian in fact filed a tort claim after being told to do so.  And the Claim was fulfilled.  (See,    )

A substantive due process claim requires specific facts that a particular defendant knowingly took property for the purpose of theft.  Here, plaintiffs cannot point to a particular officer, and indeed only surmise in that conclusion.  They only conclude that more items were missing than what was on the property list.  But they have no proof that anyone officer took any of the alleged items or that any of the alleged items actually existed.  With regard to the collectible coins, Mr. Jessop did not have an inventory list, did not have a photograph of the items,

did not insure the items and frankly, keeping the "valuable" items in a tub, not a safe, simply defies logic.

Be that as it may, there simply is no evidence that any of the named defendant Detectives, let alone anyone else, acted in a way that "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 1070, 117 L. Ed. 2d 261 (1992). With regard to the "collectibles," Detectives Kumagai, Chastain and Cantu were not present when the Stuart house search was occurring. They, in fact, informed searching detectives not to take the collectibles. With regard to the alleged monies lost at the Simpson house, money was found, counted by two officers and listed on the property sheet. There simply is no evidence again that these Detectives acted in a way that is "conscience shocking." The alleged property now allegedly lost is not on the property reports. Those items that were taken were returned with the exception of the forfeiture money. The Defendants are entitled to a judgment on this claim.

## D.     Fourth Cause of Action

The Fourth Cause of Action is a *Monell* claim against the City. A local government unit may not be held liable for the acts of its employees under a respondeat superior theory. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; *Davis v. Mason County*, 927 F.2d 1473, 1480 (9th Cir.), cert. denied, 502 U.S. 899, 112 S. Ct. 275, 116 L. Ed. 2d 227 (1991); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989). "[A] municipality cannot be held liable solely because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2018. The local government unit "itself must cause the constitutional deprivation." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992), cert. denied, 510 U.S. 932, 114 S. Ct. 345, 126 L. Ed. 2d 310 (1993). Because liability of a local governmental unit must rest on its actions, not the actions of its employees, a plaintiff must go

beyond the respondeat superior theory and demonstrate that the alleged

constitutional violation was the product of a policy or custom of the local

governmental unit. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct.

1197, 103 L. Ed. 2d 412 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469,

478-480, 106 S.Ct. 1292, 89 L. Ed. 2d 452 (1986).  To maintain a section 1983

claim against a local government, a plaintiff must establish the requisite

culpability (a "policy or custom" attributable to municipal policymakers) and the

requisite causation (the policy or custom as the "moving force" behind the

constitutional deprivation). *Monel*l, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v.*

*City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).  A plaintiff can establish a

"policy or custom" by showing: (1) an express policy that, when enforced, causes

a constitutional deprivation; (2) a widespread practice that, although not

authorized by written law or express municipal policy, is so permanent and well

settled as to constitute a custom or usage with force of law; or (3) an allegation

that the constitutional injury was caused by a person with final policymaking

authority."  Gable, 296 F.3d at 537; *Baxter v. Vigo County School Corp*., 26 F.3d

728, 735 (7th Cir. 1994).  "[O]fficial policy must  be 'the moving force of the

constitutional violation' in order to establish the liability of a government body

under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.

Ed. 2d 509 (1981) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018)); see *Rizzo v.*

*Goode*, 423 U.S. 362, 370-377, 96 S.Ct. 598, 46 L. Ed. 2d 561 (1976) (general

allegation of administrative negligence fails to state a constitutional claim

cognizable under section 1983). A "plaintiff must show that the municipal action

was taken with the requisite degree of culpability and must demonstrate a direct

causal link between the municipal action and the deprivation of federal rights."

*Board of the County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137

L. Ed. 2d 626 (1997).  A plaintiff must demonstrate that a defendant's policy was

"closely related to the ultimate injury." Harris, 489 U.S. at 391, 109 S.Ct. at 1206.

"At the very least there must be an affirmative link between the policy and particular constitutional violation." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L. Ed. 2d 791 (1985).

Fist, the Detectives are not policy makers for the City and the City is not liable for an act of vicarious liability.  With that stated there is no connection to the City that the search warrants and the way the searches were conducted were performed in an unconstitutional manner.  The warrant was signed by a judge.  The warrant is supported by probable cause.  The warrant listed those items to be seized and the places to be searched.  The searches were conducted in a lawful manner, with no damage to property and a property sheet of the items taken was maintained and given to the plaintiffs.

The Plaintiffs in fact received back the items collected that contained even some of the collectible items.  In conclusory fashion plaintiffs now allege without specifics that the money was taken by police.  Moreover, even if there were an unconstitutional act, a single act is not evidence of a long standing policy to perform searches in an unconstitutional manner.  The City is entitled to judgment.

**E.  The Detectives Are Entitled to Qualified Immunity**

Defendant Detectives contend that they are entitled to qualified immunity from Plaintiffs' claims.  Qualified immunity is a defense to claims against governmental officials "arising out of the performance of their duties. Its purpose is to permit such officials conscientiously to undertaketheir responsibilities without fear that they will be held liable in damages for actions that appear reasonable at the time, but are later held to violate statutory or constitutional rights." *Kraus v. Pierce County*, 793 F.2d 1105, 1108 (9th Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1571, 94 L. Ed. 2d 763 (1987).  Qualified immunity protects section 1983 defendants "from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004). The "heart of qualified immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the case. Instead, the threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be is true, any allegedly violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L. Ed. 2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806. Courts stress "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L. Ed. 2d 589 (1991). "Immunity ordinarily should be decided by the court long before trial." *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L. Ed. 2d 344 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991). The Ninth Circuit has explained:

Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the first step in the qualified immunity analysis is "to consider the materials submitted in support of, and in opposition to, summary judgment in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001). "If no constitutional violation is shown, the inquiry ends." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003). On the other  hand, if "the parties' submissions" create a triable issue of whether a

constitutional violation occurred, the second question is "whether the right was clearly established." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.  A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. 2151. *Squaw Valley*, 375 F.3d at 943.

The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987).  "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

Qualified immunity "turn[s] primarily on objective factors": "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims  on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156-2157.

Turning to search warrant affidavit preparation, an officer's application for a warrant is not objectively reasonable if a reasonably well-trained officer would have known that his/her affidavit failed to establish probable cause and that he should not have applied for the warrant. See *Malley*, 475 U.S. at 345, 106 S.Ct. 1092. In *Hervey*, 65 F.3d at 789, the Ninth Circuit explained:

21

1      In sum, a plaintiff can only survive summary judgment on a defense claim

2  of qualified immunity if the plaintiff can both establish a substantial showing of a

3  deliberate falsehood or reckless disregard and establish that, without the

4  dishonesty included or omitted information, the magistrate would not have issued

5  the warrant. Put another way, the plaintiff must establish that the remaining

6  information in the affidavit is insufficient to establish probable cause.

7      As noted above Plaintiffs have failed to establish that, or raise a factual

8  issue whether, defendants deprived them of a constitutional right.  As such, the

9  inquiry need go no further that defendants are entitled to qualified immunity.

10  More specifically, as to Detective Kumagai, there is no evidence of a deliberate

11  falsehood or reckless disregard regarding the search warrant affidavit.  Viewing

12  the record in Plaintiffs favor, there is no factual dispute that Detective Kumagai's

13  affidavit satisfied probable cause requirements.  Defendants have established that

14  the Plaintiffs were operating illegal coin pushers.  That the collection of the coins

15  from the machines were then exchanged for paper cash utilizing the Banks used by

16  the ATM buisiness.  This clearly shows a plan or scheme to commingle money or

17  hide the profits.  In essence, a money laundering scheme was credibly shown.

18      Moreover, as described above, the service of the warrants were performed in

19  a lawful manner.  In fact, collectible items though now allegedly missing were

20  simply not taken.  The property sheet, written by Detective Arrellanes shows that

21  she crossed property off the list after being informed not to take the collectible

22  money.  The other property sheets for the other locations also list the person who

23  found the property, where the property was located, and in the case of money two

24  officers are required to assure its collection and is then counted by two or more

25  officers.  This was done.

26      Nothing suggests that reasonable officers in defendants' positions would have

27  acted differently. Defendants are entitled to qualified immunity.

28

**Conclusion**

For the foregoing reasons, Defendants are entitled to Judgment.


Pjf and osterberg.