1  Peter J. Ferguson, SBN 108297
   Allen Christiansen, SBN 263651
2  **FERGUSON, PRAET & SHERMAN**
   A Professional Corporation
3  1631 East 18th Street
   Santa Ana, California  92705
4  (714) 953-5300 telephone
   (714) 953-1143 facsimile
5  Peterferg@aol.com

6
7  Attorneys for Defendants City of Fresno, Tomas Cantu and Curt Chastain

   Kevin M. Osterberg, SBN138760
8  Kosterberg@hbblaw.com
   **HAIGHT, BROWN & BONESTEEL, LLP**
9  3750 University Ave., Suite 560
   Riverside, CA 92501
10 (951) 341-8300; Fax (951) 341-8309

11
   Attorneys for Defendant Derik Kumagai
12

13

14              UNITED STATES DISTRICT COURT

15            EASTERN DISTRICT OF CALIFORNIA

16

17 MICAH JESSOP and BRITTAN ASHJIAN,)   NO.  1:15-cv-00316 DAD-SAB
                                    )
18                                  )   [Honorable Dale A. Drozd]
   Plaintiffs,                      )
19                                  )   **DEFENDANTS SEPARATE
          vs.                       )   STATEMENT OF
20                                  )   UNCONTROVERTED  FACTS
                                    )   AND CONCLUSIONS OF
21 CITY OF FRESNO, et al.,          )   LAW IN SUPPORT OF
                                    )   MOTION FOR SUMMARY
22                                  )   JUDGMENT**
                                    )
23                                  )
                                    )
24            Defendants.           )   Date: January 17, 2016
   _____  )   Time: 9:30 am
25                                      Courtroom:  5, 7th Floor

26

27

28

Defendants, in support of his motion for summary judgment or, in the alternative, partial summary judgment, submit that the following material facts are undisputed in this action:

| UNCONTROVERTED MATERIAL FACTS | SUPPORTING EVIDENCE AND AUTHORITIES |
|---|---|
| **DERIK KUMAGAI** | |
| 1. In calendar year 2013, Derik Kumagai was employed as a police officer with the City of Fresno Police Department.  Kumagai had been so employed for approximately thirteen (13) years, and during that time period was assigned to a number of units within the department, such as, Patrol Bureau, District Crime Suppression Team, Training Unit, and the Special Investigations Bureau Vice/Intel Unit. | 1. Declaration of Derik Kumagai ("Decl. Kumagai"), paragraph 2; Declaration of Peter Ferguson ("Decl. Ferguson"), Exhibit A, pg. 8: 5-7. |
| 2. In 2013, while assigned to the Special Investigations Bureau Vice/Intel Unit, Derik Kumagai's duties included, among other things, investigation of illegal gambling activities. | 2. Decl. Kumagai, Para. 3. |

| | |
|---|---|
| 3. In February 2013, Derik Kumagai received information from an Investigator with the California Department of Alcoholic Beverage Control regarding a possible illegal gambling machine located within a liquor store in the City of Fresno.  The machine was described as a "Coin Pusher", which was illegal ot operate under California Penal Code Sections 330a, 330b, and 330.1.  Essentially, a "Coin Pusher" is a device which awards coins or prizes to a player as a result an element of hazard or chance.  After receiving this information, Kumagai began an investigation into the suspected illegal gambling activity. | 3. Decl. Kumagai, Para. 4; Decl. Ferguson, Exhibit A, pg. 18: 17-21; 21: 6-7; 25: 25-26: 5. |

| | |
|---|---|
| 4.  The investigation expanded several months, and included, among other things, background investigations, undercover operations, surveillance operations, seizure of illegal gambling devices, and application and issuance of search warrant for a GPS tracking device.  Several members of the Special Investigation Bureau Vice/Intel Unit assisted in the investigation, including supervisor, Fresno Police Officer Sergeant Curt Chastain. | 4. Decl. Kumagai, Para. 5; Decl. Ferguson, Exhibit A, pg. 18: 17-21. |
| 5. During the investigation surveillance, Unit members observed, among other things, Brittan Ashjian emptying coin currency from a "Coin Pusher" machine located in a store; Mr. Ashjian transporting and unloading a "Coin Pusher" machine at the business address in Fresno for "ATM Online Services LLC,"; a Google map image depicting a "Coin Pusher" machine in the garage of Mr. Ashjian's residence; Mr. Ashjian servicing ATM machines in locations where "Coin Pusher" machines were also located; Mr. Ashjian going into a bank accompanied by Micah Jessop, leaving with bank | 5. Decl. Kumagai, Para. 6. |

3

bags, and going to and entering various stores; and receiving information from various store owners that either Brittan Ashjian or Micah Jessop were the people responsible for "Coin Pusher" machines located in their stores; and receiving information from another law enforcement agency regarding the seizure of a "Coin Pusher" machine frm a store in the Central Valley, with the responsible person as Micah Jessop.

| | |
|---|---|
| 6.  As a result of the investigation, Derik Kumagai had reason to believe that Brittan Ashjian and Micah Jessop were operating an illegal gambling operations, which included the placement of, and profiting from, illegal "Coin Pusher" machines in various stores throughout Fresno and the Central Valley.  Kumagai further believed that Mr. Ashjian and Mr. Jessop operating the illegal gambling operation in conjunction with their ATM business, "ATM Online Services, LLC", which had a business address of 325 E. Simpson Avenue, Fresno, California, and that they were possibly comingling the proceeds derived from the illegal "Coin Pusher" machines, with the proceeds derived from the ATM business.  In certain store locations, "Coin Pusher" machines were found to be operating along with "ATM Online Services, LLC".  As such, Kumagai had reason to believe that Brittan Ashjian and Micah Jessop were violating California Penal Code Section 186.10. | 6. Decl. Kumagai, Para. 7. |

| 7. On or about September 9, 2013, Derik Kumagai authored a Search Warrant and Affidavit which was based upon the investigation of the illegal gambling operation carried out by Mr. Ashjian and Mr. Jessop. The search warrant covered Mr. Ashjian and Mr. Jessop, their vehicles, and three locations associated with Mr. Ashjian and Mr. Jessop, which were developing during the course of the several month investigation, namely: (1) 325 E. Simpson Avenue, Fresno, California (ATM Online Services, LLC); (2) 5007 West Pinedale Avenue, Fresno California (Mr. Ashjian's residence); and (3) 2552 West Stuart Avenue, Fresno, California (Mr. Jessop's residence).  A true and correct copy of the Search Warrant and Affidavit is attached to the Declaration of Kumagai as Exhibit "A". | 7.  Decl. Kumagai, Para. 8, and Exhibit A attached to the Declaration of Kumagai. |
|---|---|
| 8. The Search Warrant and Affidavit was reviewed and signed on September 9, 2013, by the Honorable Judge Dale Ikeda of the Fresno Superior Court. | 8. Decl. Kumagai, Para. 9, and Exhibit A attached to the Declaration of Kumagai. |

6

| | |
|---|---|
| 9. On September 10, 2013, at approximately 8:00 a.m., Derik Kumagai conducted a Search Warrant pre-briefing at the Fresno Police Department Special Investigations Bureau.  Three (3) teams of Fresno police officers (approximately 16 officers), and members of other law enforcement agencies, attended the briefing.  Three search teams were formed, and each one was assigned to one of the three locations associated with Mr. Ashjian and Mr. Jessop named in the Search Warrant.  A Case Agent was assigned to lead each of the three search teams.  The Case Agents were: Det. Tomas Cantu for 325 E. Simpson Avenue, Fresno, California (ATM Online Services, LLC); Detective Belinda Anaya for 5007 West Pinedale Avenue, Fresno, Californa (Mr. Ashjian's residence); and Det. Annette Arellanes for 2552 West Stuart Avenue, Fresno, California (Mr. Jessop's residence). | 9. Decl. Kumagai,  Para. 10; Decl. Ferguson, Exhibit A, pg. 42: 5-14; 43: 22-44: 2. |

| | |
|---|---|
| 10. After the Search Warrant pre-briefing concluded, at approximately 9:45 a.m., the Search Warrant was simultaneously serviced at the three locations associated with Mr. Ashjian and Mr. Jessop, as well as their persons and vehicles. | 10. Decl. Kumagai, Para. 11. |
| 11. After service of the Search Warrant began, as the Lead Investigator, Derik Kumagai first responded to the 325 E. Simpson Avenue, Fresno, California address of ATM Online Services, LLC. Kumagai spent most of his time at this location interviewing Mr. Jessop and Mr. Ashjian.  Kumagai did not physically search the premises or vehicles at the location.  Kumagai did not physically seize any of the evidence discovered at the location.  Kumagai did not physically remove the evidence seized from the location by the assigned search team.  During the search, some officers did point out to Kumagai some of the currency that had been discovered during the search. However, Kumagai did not seize, count, remove, or transport such currency or coins from the location. | 11. Decl. Kumagai. Para. 12. |

| | |
|---|---|
| 12. The Case Agent for the 325 E. Simpson Avenue, Fresno, California address of ATM Online Services, LLC, Det. Tomas Cantu, prepared a Fresno Police Department Search Evdence and Receipt List identifying all the evidence seized at the location by the search team, including, but not limited to, any currency.  A true and correct copy of the Search Warrant Evidence and Receipt List is attached to Decl. Kumagai as Exhibit "B". | 12.  Decl. Kumagai, Para. 13 and Exhibit B is attached to the Declaration of Kumagai. |
| 13.  While at the 325 E. Simpson Avenue location, Derik Kumagai received calls from the other Case Agents progress of serving the Search Warrant at the two other locations.  For example, Det. Annette Arellanes called Kumagai from the 2552 West Stuart Avenue location, and advised that her search team had located, among other things, a coin collection, and she asked if the coin collection should be seized under the Search Warrant.  Kumagai told Det. Arellanes that the coin collection should not be seized, and should be left at the location.  Det. Arellanes agreed to do so. | 13.  Decl. Kumagai,  Para. 14. |

| | |
|---|---|
| 14.  Derik Kumagai left the 325 E. Simspon Avenue location and proceeded to 2552 West Stuart Avenue Fresno, California, which was Mr. Jessop's residence.  The actual search of that location had already concluded. Kumagai met there with Mr. Jessop's wife, Kristine Jessop, and explained the investigation and search to her. Kristine Jessop advised Kumagai, among other things, that there were additional three coin machines located near the wall of the garage of the residence, and she led Kumagai to them.  Those machines were included with the evidence seized from the 2552 West Stuart location. Kumagai did not physically search the premises or vehicles at the 2552 West Stuart Avenue location. Kumagai did not physically seize any of the evidence discovered at the location. Kumagai did not physically remove the evidence seized from the location by the assigned search team, other than assist in moving the additional three coin machines identified by Kristine Jessop.  Kumagai did not seize, count, remove, or | 14. Decl. Kumagai, Para. 15. |

| | |
|---|---|
| transport any currency or coins from the location. | |
| 15.  The Case Agent from the 2552 West Stuart Avenue, Fresno, California address, Det. Annette Arellanes, prepared a Fresno Police Department Search Warrant Evidence and Receipt List identifying all the evidence seized at the location by the search team, including, but not limited to, any currency.  A true and correct copy of the Search Warrant Evidence and Receipt List is attached to the Decl. Kumagai as Exhibit "C". | 15. Decl. Kumagai, Para. 16 and Exhibit C is attached to the Declaration of Kumagai. |

| | |
|---|---|
| 16.  Derik Kumagai left the 2552 West Stuart Avenue location and proceeded to 507 West Pinedale Avenue, Fresno, California, which was Mr. Ashjian's residence.  The actual search of that location had already concluded. Kumagai met there with Mr. Ashjian's wife, Tammy Ashjian, and explained the investigation and search to her. Kumagai and Ms. Ashjian discussed, among other things, her knowledge of the coin machines, and her work and salary with ATM Online Services, LLC.<br><br>Kumagai did not physically search the premises or vehicles at the 507 West Pinedale Avenue location. Kumagai did not physically seize any of the evidence discovered at the location. Kumagai did not physically remove the evidence seized from the location by the assigned search team, other than assist in moving the additional three coin machines identified by Kristine Jessop.  Kumagai did not seize, count, remove, or transport any currency or coins from the location. | 16. Decl. Kumagai, Para. 17. |

| | |
|---|---|
| 17.  The Case Agent from the 5007 West Pinedale Avenue, Fresno, California address, Det. Belinda Anaya, prepared a Fresno Police Department Search Warrant Evidence and Receipt List identifying all the evidence seized at the location by the search team, including, but not limited to, any currency.  A true and correct copy of the Search Warrant Evidence and Receipt List is attached to the Declaration of Kumagai as Exhibit "D". | 17.  Decl. Kumagai. Para. 18 and Exhibit D is attached to the Declaration of Kumagai. |

| | |
|---|---|
| 18.  The evidence seized as a result of the service of the Search Warrant was transported from the search locations to the office of Fresno Police Department Special Investigations Bureau Vice/Intel Unit.  Derik Kumagai did not transport such evidence.  Detectives of the Unit counted all currency that was seized during the service of the Search Warrant while the office.  The counts were performed in the presence of witness Detectives, and not by any one single Detective.  The currency seized during the service of the Search Warrant amounted to approximately $50,000.00, and was locked in a Unit office by Sergeant Chastain for safe-keeping. | 18. Decl. Kumagai Para. 19. |

14

| | |
|---|---|
| 19.  The next day, the evidence seized during the service of the Search Warrant, including, but not limited to, the currency seized, was transported from the office of the Special Investigations Bureau Vice/Intel Unit to the Fresno Police Department Property Room for booking by members of the Vice/Intel Unit.  Derik Kumagai did not participate in the transport of the evidence to the Property room.  Det. Belinda Anaya oversaw the evidence transportation and booking process.  Fresno Police Department and Evidence Forms were prepared for the booked evidence.  True and correct copies of the Property and Evidence Forms regarding "coin machines" and currency are attached to the Decl. Kumagai as Exhibit "E". | 19.  Decl. Kumagai Para. 20 and Exhibit E is attached to the Declaration of Kumagai |

| | |
|---|---|
| 20.  Within a few days of the service of the Search Warrant, Derik Kumagai was present at a meeting at the Fresno Police Department Property room where Mr. Jessop and Mr. Ashjian, and their attorneys, were allowed to view the evidence seized during the service of the search warrant, including, but not limited to, all the currency seized. Sergeant Chastain and Fresno Dep. City Attorney Larry Donaldson attended the meeting as well.  At no time during this meeting did Mr. Jessop or Mr. Ashjian claim that more than approximately $50,000.00 was seized during the search warrant. | 20.  Decl. Kumagai, Para. 21. |
| 21.  After the meeting at the Fresno Police Department Property room, and once Mr. Jessop and Mr. Ashjian learned that the potential criminal charges they could be facing including money laundering, both Mr. Jessop and Mr. Ashjian agreed (through their attorneys) to enter into Confidential Informant Contracts with the City of Fresno. | 21.  Decl. Kumagai, Para. 22. |

| | |
|---|---|
| 22.  Derik Kumagai had personal contact with Mr. Jessop and Mr. Ashjian while they worked under the Confidential Informant Contracts.  At no time did either Mr. Jessop, or Mr. Ashjian, claim that more than approximately $50,000.00 was seized during the service of the Search Warrant. | 22.  Decl. Kumagai, Para. 23. |
| 23.  Derik Kumagai prepared a Fresno Police Department report regarding the investigation and service of the Search Warrant under Case No. 13-060452. A true and correct copy of the report is attached to Decl. Kumagai as Exhibit "F". | 23. Decl. Kumagai, Para. 24 and Exhibit F is attached to the Declaration of Kumagai |
| 24.  Derik Kumagai did not take any currency, coins or property from Mr. Jessop or Mr. Ashjian, or from the locations or vehicles searched under the Search Warrant served on September 10, 2013, as alleged in the Complaint, nor did Kumagai ever take any such currency, coins or property at any time. | 24.  Decl. Kumagai, Para. 25. |

| | |
|---|---|
| 25.  Derik Kumagai has no knowledge of anyone taking any currency, coins or property from Mr. Jessop or Mr. Ashjian, or from the locations or vehicles searched under the Search Warrant served on September 10, 2013, as alleged in the Complaint. | 25.  Decl. Kumagai, Para. 26. |
| 26.  When the went to the residence an employee for the business was there. | 26. Decl. Ferguson, Exhibit A, pg. 44: 14-19. |
| 27.  The business is ATM On-Line Service. | 27. Id. 44: 20-21. |
| 28. Once the location was secured, Detective Kumagai began speaking with the female employee. | 28. Id. 45: 18-20. |
| 29. He made contact with Mr. Jessop. | 29.  Id. 46: 18-20. |
| 30. Detective Kumagai and Mr. Jessop went into the kitchen area of the residence where Detective Kumagai advised him of why he was there. | 30. Id. 46: 23-47: 2. |
| 31.  Mr. Jessop waived his rights. | 31. Id. 47: 3-4. |
| 32.  He questioned Mr. Jessop about his interest and the manner in which the business conducted alongside the ATMs and the coin pushers Mr. Jessop advised him that he had an agreement with Mr. Ashjian about operating the machines and splitting the proceeds. | 32. Id. 19-49: 3. |

| | |
|---|---|
| 33. Detective Kumagai asked Mr. Jessop if he knew the machines were illegal and he was told by Mr. Jessop that he had an idea that they were illegal because they were beginning to get seized by law enforcement. Detective Kumagai asked Mr. Jessop why he didn't contact Fresno Sheriff's office in regard to the coin pusher and he gave Detective Kumagai the locations of the other coin pushers. | 33.  Id. 49: 3-13. |
| 34. The assisting personnel were cataloging and analyzing the items to be seized and collected as evidence. Detective Kumagai was being contacted by assisting case agents at different locations about what need to be done. | 34. Id. 52: 18-24. |
| 35.  Detective Dodd, Detective Lucero and Detective Cantu were telling Detective Kumagai the locations where evidence was located. | 35. Id. 54: 9-12. |
| 36.  Detective Cantu was keeping track of this information. | 36. Id. 54: 13-15. |
| 37.  Detective Cantu was making a list. | 37.  Id. 54: 16-17. |
| 38.  Detective Kumagai was not present when the money was counted. | 38. Id. 54-18-20. |

| | |
|---|---|
| 39. The money was counted at the Simpson location. | 39.  Id. 55: 2-4. |
| 40.  Property Evidence Reports were provided to Detective Kumagai and he left a receipt at that location prior to leaving which had the total amount to be collected. | 40.  Id. 55: 5-9. |
| 41.  He left the search warrant receipt with Mr. Ashjian and Mr. Jessop. | 41. Id. 69: 1-3. |
| 42.  Detective Kumagai saw the money at the Simpson location. | 42. Id. 4-6. |
| 43. The money that was seized at the Stuart residence was seized prior to Detective Kumagai's arrival.  Assisting personnel had counted it. | 43.  Id. 75: 11-18. |
| 44.  He did not see how the money was packaged at the Stuart location. | 44.  Id. 75: 19-21. |
| 45.  He was advised by Detective Arellanes about the money. | 45. Id. 2-3. |
| 46.  Detective Kumagai advised Detective Arellanes to leave gold coins at residence. | 46. Id. 83: 4-14. |
| 47. Approximately $50,000 was seized from both locations. | 47. Id. 87: 9-18. |

| | |
|---|---|
| 48.  Detective Kumagai believed the $50,000 was connected with the investigation of money laundering, the commingling of funds with a legitimate business and attempt to clean it up, and the operation of illegal slot machines. | 48.  Id. 89: 7-12. |
| 49.  Detective Kumagai through his investigation learned that the suspects were using a business account to convert the coin currency into bill currency.  Once that is converted, now once it's commingled, there's no determining on what would be considered clean money or dirty money. | 49. Id. 90: 13-91: 6. |
| 50.  The bank personnel advised Detective Kumagai that the Plaintiffs were converting coins two to three times a week in the amount of $500 each. | 50. Id. 91: 21-24. |
| **CURT CHASTAIN** | |
| 51.  Curt Chastain has been a Fresno police officer for approximately 30 years | 51.  See Declaration of Peter Ferguson ("Decl. Ferguson"), Exhibit B, page 5, line 15. |
| 52.  He is and was at the time of the incident a supervising sergeant of the Vice Criminal Intelligence Unit. | 52.  Id. 5:16-22. |

21

| | |
|---|---|
| 53. This case came forward though normal proactive work in the gaming area.  There had been a big influx of illegal gaming machines in the city. | 53.  Id. , 6:7-21; See Declaration of Chastain ("Chastain Decl."), para. 2-3. |
| 54. Detective Kumagai came up with a lead that potentially led to a target of who was distributing these machines, thus the investigation began.  Detective Chastain was not involved in developing a surveillance plan but showed oversight of it.  He would receive verbal updates and, when necessary, did involve himself with some of the surveillance. | 54.  Id. 8:9-16; Chastain Decl. para. 3. |
| 55.  He became aware and  highly suspected that Ashjian and Jessop where definitely a distributor of the machines. | 55.  Id. 10:1-4; Chastain Decl. Para. 4. |
| 56.  This organization operated ATM machines and the illegal gambling machines that were located together at some of the locations and were both serviced by Jessop and Ashjian. | 56.  Chastain, Decl. para. 4. |

| | |
|---|---|
| 57.  He also became aware that the quarter coins collected from the illegal gambling machines were eventually exchanged for cash monies to the Banks where the ATM business did its banking.  This led him to believe that the monies received from the illegal business was being commingled with legitimate monies as a way to hide illegal proceeds.  This evidences a clear illegal purpose to Launder money in possible violation of Penal Code section 186.10.  At the very least a conspiracy to do so is evident from the actions stated. | 57.  Chastain Decl, Para 5. |
| 58.  He had reviewed the briefing sheet prior to the briefing and had made contact with other units that were going to assist in the service of the warrants. He eventually went to the Simpson Street address and was on the initial team that served the search warrant and stayed in contact with the other locations to see if they were secure, and that the searches were going to start. | 58.  Decl. Ferguson, Exhibit B, 10:19-24; Chastain Decl., Para. 7. |

23

| | |
|---|---|
| 59.  At the location he was aware that money was found in the kitchen area and in a Dodge car belonging to Mr. Jessop parked in the driveway. | 59.  Id. 21:19-22:4. |
| 60.  He was present when money was found in the Dodge car and counted. | 60.  Id. 22:10-20. |
| 61.   He did play a  supervisor role to stand there and see what kind of amounts were found and to ensure that there was a witness to it and see that it was being done correctly. | 61.  Id. 22:21-15; Chastain Decl., para. 8. |
| 62.  He did verify the operation working on the monetary amounts and show control over it to ensure that it was being handled. And that the next day to see when it was counted again prior to it being taken down into the property room.  He was active throughout the day to see what monies were being taken. | 62.  Id. 23:9-22. |
| 63.  In addition to what Detective Cantu wrote down as the scribe in the property log he kept mental notes about the quantity of the amount that was located. | 63. Id. 23:23-24:3. |
| 64.  He was the person that actually transported the money from the scene to the station. | 64.  Id. 24:4-7; Chastain Decl.,Para.  9. |

| | |
|---|---|
| 65.  When he left the Simpson location he went to the Stuart location and had taken the money with him. | 65.  Id. 24:13-15. |
| 66.  He made the decision that he would be the one to keep the monies and locked it up in his vehicle. | 66.  Id. 24:21-23. |
| 67.  And he also played a role in verifying that the same amount of money reached the station. | 67.  Id. 25:10-13. |
| 68.  And once the money was counted it was put on the receipt that was given to Mr. Jessop. | 68.  Id. 25:20-24. |
| 69.  When the money was recounted back at the station, the tally was consistent with the evidence logs collected at the particular location. | 69.  Id. 37:9-13. |
| 70.  While at the Simpson location he had received a call from Sgt. Reynolds and he talked with Detective Arellanes that they had a question regarding collectibles. And he said that was not something that we wanted to take possession of; it wasn't part of this investigation and to leave those items. | 70.  Id. 35:16-15. |

25

| | |
|---|---|
| 71.  Jessop later made an allegation that he's missing some collectible items and he assured Jessop that there was a protocol for those investigations and that he informed Jessop that he could come down and look at all the monies collected and the properties received and if there was collectible items in there then they would be returned to them because it wasn't our intention to do that. | 71.  Id. 36:2-10. |
| 72.  Later they did go to the property room, where Det. Chastain was present and they viewed the property and no one said there was more money seized than what was shown. | 72.  Id. 36:21-37:3. |
| 73.  He is also aware that Mr. Jessop and Mr. Ashjian voluntarily entered into contracts with the City to become confidential informants in exchange for the City not submitting the case to the District Attorneys Office.  Plaintiffs also agreed to forfeit $50,000 collected in the searches. | 73.  Chastain Decl. Para 11. |
| 74. He is not aware of any theft of property including money found at the search locations. | 74.  Chastain Decl. Para. 10. |

26

| | |
|---|---|
| 75.  When someone comes into the Vice Unit, Sgt Chastain wants to ensure that the potential person is a trustworthy and reliable person.  He did inquire of present and past supervisors with knowledge of Kumagai in doing his background check and well as his current and past assignments and training.  Sgt Chastain concluded that he had was a trustworthy and reliable person. | 75.  Decl. Ferguson, Exhibit B, 11:14-14:15. |
| 76.  Only after the search warrant did he become aware of a federal investigation that concerned him regarding his financial connection with certain known drug dealers. | 76. Id. 15:18-21. |
| **TOMAS CANTU** | |
| 77.  Detective Cantu has been with the Fresno Police Department for sixteen years. | 77.  Decl. Ferguson, Exhibit C, pg. 7: 2-3; Declaration of Cantu ("Decl. Cantu"), Para. 16. |
| 78.  They were investigating illegal coin pushers, illegal gambling devices and the investigation led them to Micah Jessop. | 78. Id. 9: 6-11. |
| 79.  Prior to the Ashjian/Jessop investigation, Detective Cantu was on the vice unit for approximately a year and a half. | 79. 9: 23-10: 1; Decl. Cantu, Para. 2. |

| | |
|---|---|
| 80.  Detective Cantu became aware of Mr. Jessop and Mr. Ashjian through Detective Kumagai. | 80. Id. 12: 21-25. |
| 81.  Detective Cantu was assigned the "Simpson" residence. | 81.  Id. 27: 2-4; Decl. Cantu, Para. 4. |
| 82.  He was the Detective with the job of scribe. | 82.  Id. 27: 8-10; Decl. Cantu, Para. 4. |
| 83.  Detective Cantu was to be notified of the evidence, collect it, document it, and keep possession of it until it's turned over to the person who's going to book it and transport it.) | 83.  Id. 27: 11-18; Decl. Cantu, Para. 4. |
| 84.  He did not count the money but was present while it was being counted. | 84.  Id. 31: 20-22; Decl. Cantu, Para. 5. |
| 85.  The scribe takes the money, is present when the money is being counted, or counts the money himself. He also makes sure that both officers present agree on what is being counted. | 85. Id. 32: 7-16; Decl. Cantu, Para. 5. |
| 86. The money found stayed with Sergeant Chastain. | 86.  Id. 40: 5-8. |
| 87.  Sergeant Chastain transported all the money back to the station. | 87.  Id. 47: 11-14. |
| 88.  Detective Cantu is not aware of any theft of property and money found at the subject locations. | 88.  Decl. Cantu, Para. 6. |
| **ROBERT REYNOLDS** | |
| 89.  Detective Kumagai was the lead investigator in the case. | 89.  Decl. Ferguson, Exhibit D, pg. 8: 3-5. |

| | |
|---|---|
| 90.  The briefing sheet had assignments, locations and teams. | 90.  Id. 8: 14-16. |
| 91. Detective Reynolds was assigned to the Stuart residence. | 91.  Id. 8: 17-18. |
| 92.  Detective Reynolds did not contact Detective Kumagai after he located coins wrapped in the binders. | 92. Id. 29: 25-30: 8. |
| 93.  Detective Reynolds contacted Sergeant Chastain after he found coins wrapped in binders. | 93.  Id. 30: 9-14. |
| 94.  The officers discussed if the coins should be included as part of the search warrant. | 94.  Id. 30: 15-19. |
| 95.  The officers decided that the coins were collectibles and not coins that would be coming out of a coin pusher machine. | 95.  Id. 30: 20-31: 5. |
| 96.  Detective Reynolds advised Detective Arnellanes that they were not going to take coins and Detective Arnellanes took the collectible coins off the inventory sheet. | 96.  Id. 31-12-17. |
| 97.  The coins were then placed in a suitcase in the master bedroom outside the closet. | 97.  Id. 32: 9-16. |
| 98.  The collectible coins were in the suitcase when Detective Reynolds left the premises. | 98.  Id. 32: 17-19. |

| | |
|---|---|
| 99.  Detective Reynolds saw Detective Arnellanes cross off the coins on the inventory sheet. | 99.  Id. 32: 25-33: 2. |
| 100.  The coins had been found inside a gray tote. | 100.  Id. 33: 7-9. |
| 101.  The coins were not placed back in the gray tote.  They were placed in the suitcase. | 101.  Id. 33: 11-16. |
| **Annette Arellanes** | |
| 102. Detective Arellanes has been with Fresno Police Department for Twenty-one years. | 102.  Decl. Ferguson, Exhibit E, pg. 5: 18-20. |
| 103.  She was part of the team of officers assigned to the "Stuart" residence. | 103.  Id. 8: 4-13. |
| 104.  A majority of the money was found in the master bedroom closet. | 104. Id. 14: 2-6. |
| 105.  She observed collectible coins but they were not seized. | 105.  Id. 14: 18-21. |
| 106.  Originally Detective Arellanes was going to seize the collectible coins and wrote them down on the property form. She called the case  agent and Sergeant Chastain and they decided not to collect the collectible coins and therefore they were crossed off. | 106.  Id. 14: 22-15: 4. |

| 107. When Detective Kumagai arrived at the location, the officers were done with their search and the property they were taking was located in the living room. | 107. Id. 15: 13-17. |
|---|---|
| **KEN DODD** | |
| 108. Detective Dodd has been with Fresno Police Department for over 20 years. | 108. Decl. Ferguson, Exhibit F, pg. 5: 14-15. |
| 109. He was part of the Financial Crimes Unit and was contacted by Detective Kumagai about the investigation of Mr. Jessop and Mr. Ashjian. | 109. Id. 6: 1-6. |
| 110. He was assigned to the "Simpson" residence. | 110. Id. 6: 23-24: 2. |
| 111. Detective Dodd found money in the Dodge car that pulled up. | 111. Id. 8: 5-8. |
| 112. He counted the money that he found in the car | 112. Id. 9:1-5. |
| 113. He had Detective Cantu on his left and Sergeant Chastain on my right side when counting the money. | 113. Id. 9:6-11. |
| 114. After the search and counting of monies he left. | 114. Id. 14:17-21. |
| **MICAH JESSOP** | |

31

| | |
|---|---|
| 115.  He claims that he had collectible coins, that were in a rubber tub like container, before the search. | 115.  Decl. Ferguson, Exhibit G, pg. 137:5-9. |
| 116.  He has not had the coins appraised. | 116.  Id., 137:24-138:2. |
| 117.  He did search a suit case after the search and found some collectible items. | 117.  Id. 144:2-10. |
| 118.  He is claiming some of the collectible coins were in the suitcase but not all of the collectible coins. | 118.  Id. 141::11-19. |
| 119.  He also received back from the police department silver coins | 119.  Id. 146:1-9. |
| 120. a bag with coins in it and a container with a coin in it | 120. Id. 147:20-148:6. |
| 121.  and was returned a  sleeve of silver dollars | 121.  Id. 148:11-19. |
| 122.  Ten boxes were eventually received back from the police department where some of the collectible coins were found. | 122. Id. 150:11-15. |
| 123.  After the search, a meeting with Jessop, Ashjian, their attorney's and members of the police department occurred. | 123. Id. 153:23-154:5-8. |
| 124.  Jessop did mention during the meeting that cash and coins were missing. | 124. Id. 155:5-7. |

| | |
|---|---|
| 125.  He asked Detective Kumagai "that there was a little tub that had all of my coins and gold certificates in it and uncirculated bills and I asked them if they had taken it and they said no." | 125. Id. 155:18-23. |
| 126.  Detective Kumagai informed him that the collectible were all placed in a suitcase on the floor in the master bedroom. | 126.  Id. 157:4-10. |
| 127.  His attorney made a request to see the property that was seized. | 127. Id. 160:23-161:5. |
| 128.  He did go to the department to view the property that was on a cart. | 128. Id. 162:1-11. |
| 129.  He did see "paper currency, some coins, quarters, rolls of quarters.  Inside the bag there were uncirculated bills" | 129. Id. 163:4-6. |
| 130.  He said this was not all the money. | 130. Id. 163:13-14. |
| 131.  Detective Kumagai "shrugged his shoulders and said he didn't know what to tell me." | 131. Id. 163:17-25. |
| 132.  "He [detective Kumagai] said that we could file a claim with the city". | 132.  Id. 166:11-13. |
| 133.  Jessop did enter into a contract with the City to be a confidential informant and that he would be personally forfeiting $50,000. | 133.  Decl. Ferguson, Exhibit H, pg. 17:16-18:1. |

| | |
|---|---|
| 134.  After Kumagai's  arrest , he did speak with the DEA and FBI about the search warrant. | 134.  Decl. Ferguson, Exhibit G, pg. 184:9-12. |
| 135.  Jessop did not blame Detective Kumagai or state that he thought Kumagai personally took money and collectible coins.  He stated, "I did say the Fresno Police Department" did. | 135.  Id. 183:15-22. |
| 136.  He did not see nor know of a specific officer that took money and collectibles.  He only concludes that, "I don't know what has happened behind closed doors" | 136.  Id.193:2-6. |
| 137.  He did file a claim or claims with the City of Fresno. | 137.  Id. 198:12-14. |
| **BRITTAN ASHJIAN** | |
| 138.  When the search warrants were served he was not handcuffed nor placed under arrest. | 138. Decl. Ferguson, Exhibit I, pgs. 135:24-136:24. |
| 139.  There had been concern that criminal charges might be filed against him. | 139. Id. 84:22-15. |
| 140.  Afterwards, he entered into a contract with the City of Fresno. | 140.  Id., 108:5-24. |
| 141.  Prior to entering into the agreement he received legal advice and agreed to the terms of the contract. | 141.  Id. 109:3-5, 10-12. |

| | |
|---|---|
| 142.   He agreed that by entering into the contract he was to allow $50,000 to be forfeited to the City. | 142.  Id.114:23-115:2. |
| 143.  After the search, property was returned back but a computer had been accidentally broken. | 143.  Id. 134:20-135:16. |
| 144.  He did file a tort claim with the City for the broken computer and was paid for the damage. | 144.  Id. 132:24-133:14. |
| 145.  He knew he had cash in his vehicle the day of the search but did not know how much. | 145.  Id. 64:8-9. |
| 146.  His house was searched.  $400 dollars in cash was collected in the search and was returned back to him. | 146.  Id. 80:7-15. |

## CONCLUSIONS OF LAW

1.     The searches were conducted pursuant to a valid search warrant.

"Where the alleged *Fourth Amendment* violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in 'objective good faith.'" *United States v. Leon*, 468 U.S. 897, 922-923, 104 S.Ct. 3405(1984).

2.     Here it is alleged that "the theft of the currency and coins was unlawful and unjustified, and Plaintiffs were provided with no means of redress or procedure whereby they could dispute said deprivation"

"The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L. Ed. 2d 433 (1979) (quoting 42 U.S.C. § 1983). "*Section 1983* imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker,* 443 U.S. at 146, 99 S.Ct. at 2695.

"The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished 'without due process of law.'" *Baker, 443 U.S. at 145, 99 S.Ct. at 2695.*

The Court held that to the extent Plaintiff alleges his property was taken without due process of law, the procedural due process claim is barred.  In part, the action is barred by the case of *Parratt v. Taylor*, 451 U.S. 527 (1981), because the actions constituted "random and unauthorized" conduct and any pre-deprivation procedures instituted by the State would have been impractical under the circumstances.  In *Parratt*, the Supreme Court held that "a negligent deprivation of property by state officials does not violate the Fourteenth Amendment if an adequate post-deprivation state remedy exists. Citing *Hudson v. Palmer*, 468 U.S. 517, 519 (1984).  Here then, the filing of a state tort claim and utilization of the state procedures is all that is required.  Thus Plaintiffs second cause of action fails and the defendants are entitled to judgment.

3.     Plaintiffs are now alleging a Substantive Due Process Claim.

First, Plaintiffs simply do  not have a Fourteenth Amendment claim and, even if they did, it should be analyzed under the Fourth Amendment reasonableness standard here.  See *Teixeira v. County of Alameda*, 2016 U.S. App. LEXIS 8925 at *12 (2016), *Albright v. Oliver*, 510 U.S. 266, 273 (1979) and *Graham v.Connor*, 490 U.S. 386, 395 (1989).

"The concept of 'substantive due process,' semantically awkward as it may be, forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998). The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 1070, 117 L. Ed. 2d 261 (1992). As a starting point, there is no evidence that Defendants engaged in conscience shocking activity.

Be that as it may, there simply is no evidence that any of the named defendant Detectives, let alone anyone else, acted in a way that "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 1070, 117 L. Ed. 2d 261 (1992).

4.     The Fourth Cause of Action is a *Monell* claim against the City.

A local government unit may not be held liable for the acts of its employees under a respondeat superior theory. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; *Davis v. Mason County*, 927 F.2d 1473, 1480 (9th Cir.), cert. denied, 502 U.S. 899, 112 S. Ct. 275, 116 L. Ed. 2d 227 (1991); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989). "[A] municipality cannot be held liable solely because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2018. The local government unit "itself must cause the constitutional deprivation." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992), cert. denied, 510 U.S. 932, 114 S. Ct. 345, 126 L. Ed. 2d 310 (1993).

Because liability of a local governmental unit must rest on its actions, not the actions of its employees, a plaintiff must go beyond the respondeat superior theory and demonstrate that the alleged constitutional violation was the product of a policy or custom of the local governmental unit. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L. Ed. 2d 412 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-480, 106 S.Ct. 1292, 89 L. Ed. 2d 452 (1986). To maintain a section 1983 claim against a local government, a plaintiff must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind the constitutional deprivation). *Monel*l, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

A plaintiff can establish a "policy or custom" by showing: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." Gable, 296 F.3d at 537; *Baxter v. Vigo County School Corp*., 26 F.3d 728, 735 (7th Cir. 1994). "[O]fficial policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 70 L. Ed. 2d 509 (1981) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018)); see *Rizzo v. Goode*, 423 U.S. 362, 370-377, 96 S.Ct. 598, 46 L. Ed. 2d 561 (1976) (general allegation of administrative negligence fails to state a constitutional claim cognizable under section 1983). A "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

1    A plaintiff must demonstrate that a defendant's policy was "closely related

2 to the ultimate injury." Harris, 489 U.S. at 391, 109 S.Ct. at 1206. "At the very

3 least there must be an affirmative link between the policy and particular

4 constitutional violation." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct.

5 2427, 85 L. Ed. 2d 791 (1985).

6

7

8    5. The Detectives Are Entitled to Qualified Immunity

9

10    Defendant Detectives contend that they are entitled to qualified immunity

11 from Plaintiffs' claims.  Qualified immunity is a defense to claims against

12 governmental officials "arising out of the performance of their duties. Its purpose

13 is to permit such officials conscientiously to undertaketheir responsibilities

14 without fear that they will be held liable in damages for actions that appear

15 reasonable at the time, but are later held to violate statutory or constitutional

16 rights." *Kraus v. Pierce County*, 793 F.2d 1105, 1108 (9th Cir. 1986), cert. denied,

17 480 U.S. 932, 107 S. Ct. 1571, 94 L. Ed. 2d 763 (1987).

18

19    Qualified immunity protects section 1983 defendants "from liability for civil

20 damages insofar as their conduct does not violate clearly established statutory or

21 constitutional rights of which a reasonable person would have known." *Squaw*

22 *Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004).  The "heart of

23 qualified immunity is that it spares the defendant from having to go forward with

24 an inquiry into the merits of the case. Instead, the threshold inquiry is whether,

25 assuming that what the plaintiff asserts the facts to be is true, any allegedly

26 violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir.

27 1995).

28

1    Qualified immunity is "an entitlement not to stand trial or face the other

2  burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86

3  L. Ed. 2d 411 (1985). The privilege is "an immunity from suit rather than a mere

4  defense to liability; and like an absolute immunity, it is effectively lost if a case is

5  erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806.

6  Courts stress "the importance of resolving immunity questions at the earliest

7  possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534,

8  116 L. Ed. 2d 589 (1991).  "Immunity ordinarily should be decided by the court

9  long before trial." *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

10

11    The issue of qualified immunity is "a pure question of law." *Elder v.*

12 *Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L. Ed. 2d 344 (1994); *Romero*

13 *v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991). The Ninth Circuit has

14 explained:

15

16    Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272

17 (2001), the first step in the qualified immunity analysis is "to consider the

18 materials submitted in support of, and in opposition to, summary judgment in

19 order to decide whether a constitutional right would be violated if all facts are

20 viewed in favor of the party opposing summary judgment." *Jeffers v. Gomez*, 267

21 F.3d 895, 909 (9th Cir. 2001). "If no constitutional violation is shown, the inquiry

22 ends." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003). On

23 the other  hand, if "the parties' submissions" create a triable issue of whether a

24 constitutional violation occurred, the second question is "whether the right was

25 clearly established." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.  A constitutional

26 right is clearly established when "it would be clear to a reasonable officer that his

27 conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. 2151.

28 *Squaw Valley*, 375 F.3d at 943.

1

2      The "contours" of the allegedly violated right "must be sufficiently clear

3  that a reasonable official would understand that what he is doing violates that

4  right. . . . [I]n the light of preexisting law the unlawfulness must be apparent."

5  *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L. Ed. 2d 523

6  (1987).  "If the officer's mistake as to what the law requires is reasonable,

7  however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205,

8  121 S.Ct. 2151.

9

10      Qualified immunity "turn[s] primarily on objective factors": "Reliance on

11  the objective reasonableness of an official's conduct, as measured by reference to

12  clearly established law, should avoid excessive disruption of government and

13  permit the resolution of many insubstantial claims  on summary judgment."

14  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396

15  (1982).  The qualified immunity standard "gives ample room for mistaken

16  judgments" by protecting "all but the plainly incompetent or those who knowingly

17  violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed.

18  2d 271 (1986). "If the law did not put the officer on notice that his conduct would

19  be clearly unlawful, summary judgment based on qualified immunity is

20  appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156-2157.

21

22

23

24

25

26  //

27  //

28  //

41

1

2       Turning to search warrant affidavit preparation, an officer's application for

3  a warrant is not objectively reasonable if a reasonably well-trained officer would

4  have known that his/her affidavit failed to establish probable cause and that he

5  should not have applied for the warrant. See *Malley*, 475 U.S. at 345, 106 S.Ct.

6  1092. In *Hervey*, 65 F.3d at 789, the Ninth Circuit explained:

7                              Respectfully submitted,

8

9  DATED: December 16, 2016          FERGUSON, PRAET & SHERMAN, APC

10

11                                   /s/ Peter J. Fer guson
                                     PETER J. FERGUSON
12                                   ALLEN CHRISTIANSEN
                                     Attorneys for Defendant Defendants City of
13                                   Fresno, Tomas Cantu and Curt Chastain

14  DATED: December 16, 2016          HAIGHT, BROWN & BONESTEEL, LLP
15

16                                   /s/ Kevin M. Osterberg
                                     Kevin M. Osterberg
17                                   Attorneys for Defendant Derik Kumagai

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28