Darrell J. York, Esq. (SBN 145601)
Sarah L. Garvey, Esq. (SBN 202491)
Law Offices of York & Garvey
137 N. Larchmont Blvd., #506
Los Angeles, CA 90004
Telephone: (866) 908-2121
Facsimile: (877) 221-3306
Email: djylaw@gmail.com
Email: sarahgarvey@yahoo.com

Kevin G. Little, Esq. (SBN 149818)
Post Office Box 8656
Fresno, CA 93747
Telephone: (559) 342-5800
Facsimile: (559) 420-0839
Email:  kevinglittle@yahoo.com

Attorneys for MICAH JESSOP and BRITTAN ASJIAN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICAH JESSOP and BRITTAN ASHJIAN,<br><br>                    Plaintiffs,<br><br>     v.<br><br>CITY OF FRESNO; DERIK KUMAGAI; TOMAS CANTU; CURT CHASTAN; KEN DODD; FRESNO POLICE OFFICER REYNOLDS; PAUL ZARAUSA; ANNETTE ARELLANES; DAVID GARZA; CURTIS BUNCH; and DOES 1-10, inclusive,<br><br>                    Defendants. | No.  1:15-cv-00316 DAD-SAB<br><br>*(HONORABLE DALE A. DROZD)*<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT OR SUMMARY ADJUDICATION; SUPPORTING DECLARATIONS AND EXHIBITS<br><br>DATE:  January 17, 2017<br>TIME:  9:30 A.M.<br>COURTROOM:  5, 7TH |

TO THE HONORABLE COURT:

     As demonstrated herein, the record is thoroughly disputed, and summary judgment or adjudication would be improper. The defendants performed a warrant search of the plaintiffs' office and residences and reported seizing only $37,014 therefrom.

1    However, plaintiffs contend that more than $131,380 was seized,

2    as well as additional very valuable collectible coins and rare

3    bills. A jury must decide which of these diametrically

4    opposed version of events is correct, because plaintiffs' version

5    of events would support the constitutional violations alleged.

6    Therefore, under the applicable standard of review, the issues in

7    this case will must be resolved at the requested jury trial.

TABLE OF CONTENTS

I.   PROCEDUREAL AND FACURAL BACKGROUND . . . . . . . . . .  1

II.  LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . .  1

III. ANAYLSIS . . . . . . . . . . . . . . . . . . . . . .  3

     A.   THEFT OF MONEY FROM THE PLAINTIFFS DURING THE
EXECUTION OF A SEARCH WARRANT IS AN UNREASONABLE SEARCH AND
SEIZURE AND THUS A VIOLATION OF THE FOURTH AMENDMENT . . .  4

     B.   THE STEALING OF THE PLAINTIFFS' $131,380 AND RARE
COINS AND CURRENCY ALSO VIOLATES SUBSTANTIVE DUE PROCESS .  8

     C.   THE DEFENDANTS' CANNOT WITHHOLD PERTINENT DISCOVERY
AND THEN ALSO SEEK SUMMARY JUDGMENT ON MONELL GROUNDS. . .  10

     D.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. 19

i

1                                 TABLE OF AUTHORITIES

2    **_FEDERAL CASES_**

3    *Adickes v. S.H. Kress & Co.*
          398 U.S. 144, 158–59 (1970). . . . . . . . . . . . . . .  1
4

5    *Amnesty America v. Town of West Hartford*
          361 F.3d 113, 125 (2d Cir. 2004). . . . . . . . . . .  12
6

7    *Anderson v. Liberty Lobby, Inc.*
          477 U.S. 242, 248 (1986) . . . . . . . . . . . . . . .  2
8

9    *Barnett v. Centoni*
          31 F.3d 813 (9ᵗʰ Cir. 1993). . . . . . . . . . . . . .  3
10

11   *Brittain v. Hansen*
          451 F.3d 982, 991 (9th Cir. 2006) . . . . . . . . . .  9
12

13   *Celotex Corp. v. Catrett*
          477 U.S. 317, 323 (1986). . . . . . . . . . . . . . .  2
14

15   *Chevron Corp. v. Pennzoil Co.*
          974 F.2d 1156, 1162 (9th Cir. 1992) . . . . . . . . .  10
16

17   *Christie v. Iopa*
          176 F.3d 1231, 1236 (9th Cir. 1999) . . . . . . . . .  12
18

19   *Chuman v. Wright*
          76 F.3d 292, 294 (9th Cir. 1996). . . . . . . . . . .  7
20

21   *City of Canton v. Harris*
          489 U.S. 377, 388 (1989). . . . . . . . . . . . . . .  11
22

23   *Collins v. Guerin*
          2014 U.S. Dist. LEXIS 174435, *12-13 (S.D.Cal. 2014).  3
24

25   *County of Riverside*
          120 F.3d 965, 979 (9th Cir. 1997) . . . . . . . . . .  5
26

27   *Ellertson v. City of Mesa*
          No. cv-15-00765_PHX-GMC (D. Arizona 2016). . . . . . .  5

28                                       ii

1

*Fiacco v. City of Rensselaer*
        783 F.2d 319, 328 (2d Cir. 1986). . . . . . . . . . . . 11

2

*Ganwich v. Knapp*
3        319 F.3d 1115, 1119 (9th Cir. 2003) . . . . . . . . . 5

4    *Cf. Harris ex rel. Harris v. Robinson*
        273 F.3d 927, 930-31 (10th Cir. 2001) . . . . . . . . 9

5

*Hopkins v. Andaya*
6        958 F.2d 881, 888 (9th Cir. 1992) . . . . . . . . . . 1

7    *Jones v. Williams*
        297 F.3d 930, 936 (9th Cir. 2000) . . . . . . . . . . 7

8

*Lake Nacimiento Ranch Co. v. San Luis Obispo County*
9        841 F.2d 872, 875 (9th Cir. 1987) . . . . . . . . . . 1

10

*Liston v. County of Riverside*
11        120 F.3d 965, 979 (9th Cir. 1997) . . . . . . . . . . 5

12

*Lolly v. County of Orange*
13        351 F.3d 410, 417 (9th Cir. 2003) . . . . . . . . . . 7

14

*Lust v. Merrell Dow Pharmaceuticals, Inc.*
15        89 F. 3d 594, 598 (9th Cir. 1996) . . . . . . . . . . 10

16

*Mann v. City of Tuscon*
17        782 F.2d 790, 792 (9th Cir. 1985 . . . . . . . . . . 3

18   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
        475 U.S. 574, 587, 106 S. Ct. 1348,
19        89 L. Ed. 2d 538 (1986). . . . . . . . . . . . . . . 3

20   *Moeller v. Taco Bell Corp.*
        No. 02-cv-05849-PJH, Dkt. No. 457, 9:25-27,
21        (N.D.Cal., Oct. 6, 2009) . . . . . . . . . . . . . . 10

22   *Parratt v. Taylor*
        451 U.S. 527, 536-537 (1981) . . . . . . . . . . . . 8

23

*Rains v. Criterion Sys.*
24        80 F.3d 339, 344 (9th Cir. Cal. 1996). . . . . . . . 19

25   *Rutherford v. City of Berkeley*
        780 F.2d 1444, 1448 (9th Cir. 1986). . . . . . . . . 7

26

27

28                                    iii

*San Jose Charter of Hells Angels Motorcycle Club vs. City of San Jose*
    402 F3d. 962, 971 (9th Cir. 2005) . . . . . . . . . . . 5

*Santos v. Gates*
    287 F.3d 846 (9th Cir. 2002)  . . . . . . . . . . . . . 7

*Saucier v. Katz*
    533 U.S. 194, 204-206 (2001)  . . . . . . . . . . 19, 20

*Soremekun v. Thrifty Payless, Inc.*
    509 F.3d 978, 984 (9th Cir. 2007). . . . . . . . . . . . 2

*Taylor v. Knapp*
    871 F.2d 803 (9th Cir. 1988) . . . . . . . . . . . . . . 3

*Ting v. United States*
    927 F.2d 1504, 1511-1512 (9th Cir. 1991) . . . . . . . . 7

*Tolan v. Cotton*
    134 S.Ct. 1861, 1865-1866 (2014) . . . . . . . . . . . 19

*United States v. Furminger*
    No. CR-14-102 (N.D.Cal. 2014). . . . . . . . . . . . . . 4

*United States v. James Daniel Good Real Property*
    510 U.S. 43, 49 (1993) . . . . . . . . . . . . . . . . 10

*United Steelworkers of America v. Phelps Dodge Corp.*
    865 F. 2d 1539, 1543 (9th Cir. 1989) . . . . . . . . 2, 10

**Federal Statutes**

Federal Rules of Civil Procedure Rule 56(c)(2). . . . . . 6, 7

iv

1

**MEMORANDUM OF POINTS AND AUTHORIES**

2

**I.    PROCEDURAL AND FACTUAL BACKGROUND**

3      Plaintiffs filed their complaint on September 16, 2014,

4 alleging four (4) causes of actions against Defendants alleging

5 (1) Unreasonable Search and Seizure (42 U.S.C. §1983),

6 (2) Deprivation of Property Without Due Process, (3) Violation of

7 Substantive Due Process, and (4) Municipal Liability for

8 Unconstitutional Custom or Policy (42 U.S.C. § 1983).

9      In their accompanying statement of disputed facts,

10 Plaintiffs establish that all the material facts are disputed.

11 The facts set forth in that document are incorporated herein by

12 reference, in accordance with Federal Rule of Civil Procedure

13 10(c). The facts pertinent to refuting the defendants' arguments

14 are discussed herein as applicable.

15

**II.       LEGAL ARGUMENT**

16      A.    Standard of Review

17      The standard of review for a motion for summary judgment

18 under FRCP 56 is well established. On a motion for summary

19 judgment, the Court views the evidence presented in the motion in

20 the light most favorable to non-moving party.  Even where the

21 basic facts are undisputed, summary judgment should be denied if

22 reasonable minds could differ on the inferences to be drawn from

23 those facts. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59

24 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841

25 F.2d 872, 875 (9th Cir. 1987).  Despite a first-hand testimony to

26 the contrary, entirely circumstantial evidence may be sufficient

27 to create a triable issue of fact. *Hopkins v. Andaya,* 958 F.2d

28

1

1  881, 888 (9th Cir. 1992) (holding there was a triable issue of

2  fact on whether the officer's reported subjective fear of being

3  killed was objectively reasonable because a medical report showed

4  the officer's injuries were superficial).   Civ. P. 56. The

5  moving party bears the initial burden of "informing the district

6  court of the basis for its motion, and identifying those portions

7  of the pleadings, depositions, answers to interrogatories, and

8  admissions on file, together with the affidavits, if any, which

9  it believes demonstrate the absence of a genuine issue of

10 material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

11 (1986) (internal quotation marks omitted). A fact is material if

12 it could affect the outcome of the suit under the governing

13 substantive law; "irrelevant" or "unnecessary" factual disputes

14 will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

15 242, 248 (1986).

16      In ruling on a motion for summary judgment, a court does not

17 make credibility determinations or weigh evidence. See *Anderson*,

18 477 U.S. at 255.  Rather, "[t]he evidence of the non-movant is to

19 be believed, and all justifiable inferences are to be drawn in

20 his favor." Id. Only admissible evidence may be considered in

21 deciding a motion for summary judgment. *United Steelworkers of*

22 *America v. Phelps Dodge Corp.*, 865 F. 2d 1539, 1543 (9th Cir.

23 1989) (en banc).

24      "Conclusory, speculative testimony in affidavits and moving

25 papers is insufficient to raise genuine issues of fact and defeat

26 summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d

27 978, 984 (9th Cir. 2007).

28                                    2

**III.   ANAYLSIS**

Defendants assert that (1) the search of the Plaintiffs' business and residences were pursuant to a valid search warrant so there can be no Fourth Amendment violation, (2) Plaintiffs were not deprived of procedural due process because they had a post-deprivation remedy by filing a governmental tort claim,[1] (3) there was no substantive due process violation because the actions of the defendants did not shock the conscience, and (4) there can be no municipal liability because the City did not have a custom or policy of that caused the constitutional deprivation.

Defendants' motion asks the Court to take as true the version of events presented by Defendants and to disregard the testimony of Plaintiffs and Kristine Jessop (Decl. of Kristine Jessop). In deciding this motion, the facts and all inferences therefrom "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co.*

---

[1] Recognizing this Circuit's holdings from *Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1993), and related decisions, the plaintiffs abandon their procedural due process claim. The existence of the Government Code claim for damages under California law, whether or not utilized and whether or not availing, negates a procedural due process claim. However, The Ninth Circuit has held that the availability of an adequate post-deprivation remedy does not bar a substantive due process claim under § 1983. *See Taylor v. Knapp*, 871 F.2d 803 (9th Cir. 1988); *Mann v. City of Tuscon*, 782 F.2d 790, 792 (9th Cir. 1985) ("The *Parratt* rationale does not apply to a denial of substantive due process, for in such a case the deprivation is the taking of property or liberty itself, not the process by which the taking is accomplished, and the availability of neither pre- nor post-deprivation process is relevant."). Nor is the existence of a post-deprivation remedy relevant for Fourth Amendment purposes. *See Collins v. Guerin*, 2014 U.S. Dist. LEXIS 174435, *12-13 (S.D.Cal. 2014)("[T]o the extent Plaintiff is alleging that the governmental power of a search warrant was used for purposes of oppression and both his substantive due process rights as well as his Fourth Amendment rights were violated by an illegal search and seizure, such a claim does not implicate a pre-deprivation hearing and is not barred.").

3

1 | *v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.

2 | Ed. 2d 538 (1986).  Since Defendants want to have summary

3 | judgment based on the facts viewed in the light most favorable to

4 | them, their motion is generally unpersuasive.

5 | **A.   THEFT OF MONEY FROM PLAINTIFFS DURING THE EXECUTION OF A**

6 | **SEARCH WARRANT IS AN UNREASONABLE SEARCH AND SEIZURE AND THUS**

7 | **A VIOLATION OF THE FOURTH AMENDMENT.**

8 | 

9 | Defendants assert that since they obtained and executed a

10 | valid search warrant there was no unconstitutional or

11 | unreasonable seizure, regardless of whether they seized

12 | additional unreported sums of money, rare coins, and collectible

13 | currency.  However, a search warrant does not give officers

14 | license to commit theft of personal property unrelated to the

15 | search and not documented as being seized as part of the search.

16 | Officers have been prosecuted under the federal civil rights laws

17 | as criminals and imprisoned for engaging in such misconduct,[2] so

18 | it clearly is not legal or constitutional.  Yet the moving

19 | defendants contend that it is.  Because the plaintiff's evidence

20 | shows, in the light most favoring them, that an unlawful search

21 | unrelated to the warrant seizures occurred, summary judgment

22 | would be plainly improper.

23 | The Ninth Circuit has held "The test of what is necessary to

24 | "execute a warrant effectively" is reasonableness. "An officer's

---

[2] As one example of many possible, *see United States v. Furminger*, No. CR-14-102 (N.D.Cal. 2014).  The indictment, which included criminal civil rights charges under 18 U.S.C. § 241 based on the alleged thefts, can be found at the following link:  https://www.justice.gov/file/181306/download.  Furminger's conviction was recently affirmed.  *See* https://scholar.google.com/scholar_case?case=17281839245686228780&hl=en&as_sdt=6&as_vis=1&oi=scholarr.

4

1   conduct in executing a search is subject to the Fourth

2   Amendment's mandate of reasonableness from the moment of the

3   officer's entry until the moment of departure." *Lawmaster v.*

4   *Ward,* 125 F.3d 1341, 1349 (10th Cir. 1997). "When officers obtain

5   a warrant to search an individual's home, they also receive

6   certain limited rights to occupy and control the property;

7   however, the Fourth Amendment binds the officers such that the

8   right to search a home concomitantly obliges the officers to do

9   so in a reasonable manner." *Id.* at 1350. *San Jose Charter of*

10  *Hells Angels Motorcycle Club vs. City of San Jose*, 402 F3d. 962,

11  971 (9th Cir. 2005).  The Ninth Circuit has also held that

12  behavior or actions "beyond that necessary to execute [the]

13  warrant[s] effectively, violates the Fourth Amendment." *Liston v.*

14  *County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997).

15      The search warrant in the case at bar did not give the

16  Defendant officers the right to commit the theft of money and

17  collectible gold coins and currency, and such action is clearly

18  reasonable.  Unquestionably, the theft of over $100,000 and

19  collectible coins/currency exceeded the legitimate scope of the

20  search warrant.

21      Exceeding the scope of a search warrant violates the clearly

22  established rights of the Plaintiffs. *Ellertson v. City of Mesa,*

23  No. cv-15-00765_PHX-GMC (D. Arizona 2016). This principle

24  has been long established. "A seizure becomes unlawful when it is

25  'more intrusive than is necessary.'" *Ganwich v. Knapp*, 319 F.3d

26  1115, 1119 (9th Cir. 2003) (quoting *Florida v. Royer*, 460 U.S.

27  491, 504 (1983)); *see also Wilson v. Lane*, 526 U.S. 603, 611

28                                  5

1    (1999) (citing *Ariz. v. Hicks*, 480 U.S. 321, 325 (1987)).

2       The defendant officers testified that they only seized

3 approximately $37,014 in currency when they executed the search

4 warrants. (SUF #19, 20, 22, 24, & 49).  However, Plaintiffs

5 testified that they had $131,380 in currency and that amount of

6 money was seized by the defendant officers. (SUF #18, 19, 20,

7 22).  The Plaintiffs voiced their concern that money was missing

8 when they viewed the currency at the Fresno Police Department

9 Evidence Room.  (SUF #20).  Plaintiff Jessop also complained that

10 his collectible coins and currency were taken from his home by

11 officers during the search. (SUF #20).  Plaintiff Jessop's wife,

12 Kristine Jessop, also said the collectible coins were at their

13 home prior to the search by the officers and then they were

14 missing after the search.  See Declaration of Kristine Jessop.

15       Defendants have tried to insulate Defendant Kumagai from

16 having any access to the money or coins by saying he never

17 seized, counted or transported the money.  (SUF #11& 14).  They

18 have attempted to insulate Defendant Kumagai in this manner

19 because he was recently convicted in this Court of extorting

20 money from drug dealers and sentenced to a federal prison term.

21 (SUF #1). Plaintiff Jessop testified that he saw Defendant

22 Kumagai counting the money inside the house.  (SUF #11).

23       Furthermore, Defendant Kumagai claims he did not search the

24 Stuart location.  (SUF #14).  However, Kristine Jessop, states

25 That Kumagai went to the rear area of the home of at least two

26 different occasions and this was done after the other officers

27 had already searched the house.  See Declaration of Kristine

28                           6

Jessop.  The collectible gold coins were in the master bedroom
which was the area in which Kristine Jessop saw Kumagai go while
she was in the living room. See Declaration of Kristine Jessop.
Both Plaintiff Jessop and Kristine Jessop state that the
coins and currency were in the master bedroom before the officers
arrived but were missing after they left.  (SUF #15 & 24).
Kristine Jessop also stated that Kumagai was the last one to
leave the house.  See Declaration of Kristine Jessop.

Finally, the defendants seem to argue that because the
plaintiffs did not witness the theft with their own eyes, summary
judgment should issue.  As common sense dictates, an officer is
not entitled to summary judgment simply because a plaintiff did
not witness his misconduct, so long as other evidence exists
which permits a circumstantial inference that the officer
nonetheless committed it. *See Rutherford v. City of Berkeley*, 780
F.2d 1444, 1448 (9th Cir. 1986); *Santos v. Gates*, 287 F.3d 846
(9th Cir. 2002); *Lolly v. County of Orange*, 351 F.3d 410, 417
(9th Cir. 2003); *Ting v. United States*, 927 F.2d 1504, 1511-1512
(9th Cir. 1991). Furthermore, even where an officer does not
personally commit an unlawful act, he can be responsible for the
unlawful acts of his cohorts where he participates in an illicit
activity as an integral participant. *Jones v. Williams*, 297 F.3d
930, 936 (9th Cir. 2000); *Chuman v. Wright*, 76 F.3d 292, 294 (9th
Cir. 1996).  The evidence in this case, as set forth more fully
in the incorporated statement of disputed facts, shows that ex-
Det. Kumagai was the one who actually stole the missing money,
but the other officers on scene who had overall responsibility

7

for the warrant operation, i.e., defendants Cantu and Chastain, had an opportunity to witness what actually was seized and therefore knew that the amounts seized were being grossly underreported. Under applicable law, all of these defendants are liable.

Based on the foregoing, there is a triable issue of fact as to whether the defendants, and most specifically former Det. Kumagai, committed a theft of currency and coins when the served the search warrants.  Summary judgment on this ground should be denied.

**B.   THE STEALING OF THE PLAINTIFF'S $131,380 AND RARE COINS AND CURRENCY ALSO VIOLATES SUBSTANTIVE DUE PROCESS**

The defendants also contend that a theft of well over $100,000 during a search does not violate substantive due process, but it certainly does.  The Due Process Clause of the Fourteenth Amendment protects individuals from arbitrary government action by prohibiting states from depriving people of "life, liberty, or property without due process of law." U.S. Const. amend. XIV. The basic elements of a due process claim are: (1) the deprivation, (2) of a liberty or property interest, (3) by officials acting under color of state law. *Parratt v. Taylor,* 451 U.S. 527, 536-537 (1981).

A person injured because of police misconduct may prosecute a substantive due process claim under section 1983.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998).  "Substantive due process protects individuals from arbitrary deprivation of

8

their liberty by government." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). To establish a constitutional violation based on substantive due process, a plaintiff must show not only a deprivation of her liberty but also conscience-shocking behavior by the government. *Id*. This element is satisfied by proof of egregious official conduct that can be said to be arbitrary in a constitutional way. *See County of Sacramento v. Lewis*, 523 U.S. at 846. This Court accordingly must determine whether the defendants engaged in "conduct intended to injure in some way unjustifiable by any government interest." *Id*. at 849.

What governmental interest exists that would in any way support or justify stealing someone's property, particularly of the magnitude involved in this case? The plaintiffs present evidence that $131,380 was taken from them, not the $37,014 listed in the defendants' seizure logs. In addition, rare coins and currency worth many thousands more were also taken and never returned, contrary to the false indications of the search logs. The value of this property is more than the average person saves in a lifetime, so of course the theft of this amount by a government actor under the pretense of legitimate law enforcement action is conscience-shocking. *Cf. Harris ex rel. Harris v. Robinson*, 273 F.3d 927, 930–31 (10th Cir. 2001) (holding that considerations in determining whether official action shocks the conscience are the degree of outrageousness and magnitude of potential or actual harm). Accordingly, for the same reasons and based on the same facts supporting the plaintiffs' Fourth

9

Amendment claim, the defendants' actions also violated substantive due process.  Indeed, certain misconduct may implicate multiple constitutional provisions.  *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 49 (1993) ("We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another.").

C.    **THE DEFENDANTS CANNOT WITHHOLD PERTINENT DISCOVERY AND THEN ALSO SEEK SUMMARY JUDGMENT ON MONELL GROUNDS**

Although the defendants also move for summary judgment as to plaintiffs' municipal liability claim, they withheld pertinent evidence due to an asserted privilege, as shown below.  The defendants' privilege assertion prevents the Court from reaching the merits of their *Monell* argument.  *See Moeller v. Taco Bell Corp.*, No. 02-cv-05849-PJH, Dkt. No. 457, 9:25-27, (N.D.Cal., Oct. 6, 2009) (holding at the summary judgment stage that "Defendant may not proffer favorable information and conceal potentially unfavorable information on the same subject by hiding behind a claim of privilege.").  The defendants clearly cannot use their asserted privilege as both a sword and shield.  *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).  Thus, the defendants therefore cannot introduce favorable evidence on summary judgment to meet their initial burden of proof.  *See Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F. 3d 594, 598 (9th Cir. 1996); *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F. 2d 1539, 1543 (9th Cir. 1989) (en banc).

10

1

2
    In their Complaint (Dkt. No. 1), the plaintiffs allege

municipal liability on the following pertinent grounds:
3

4
        49(a) Employing and retaining as police officers and
        other personnel, including Defendants CHASTAIN,
5       KUMAGAI, CANTU, DODD, REYNOLDS, ZARAUSA, ARRELLANES,
        GARZA, BUNCH, FRY and DOES 1-10 who Defendant CITY at
6       all times material herein knew or reasonably should
        have known had propensities for abusing their authority
7       by misappropriating and stealing individuals personal
        property and by failing to follow written DEPARTMENT
8       policies and procedures regarding the seizure of large
        sums of cash from individuals;
9

10      49(b) Inadequately supervising, training, controlling,
        assigning, and disciplining DEPARTMENT's police
11      officers and other personnel, including, and CHASTAIN,
        KUMAGAI, CANTU, DODD, REYNOLDS, ZARAUSA, ARRELLANES,
12      GARZA, BUNCH, FRY and DOES 1-10, whom Defendant CITY
        knew or in the exercise of reasonable care should have
13      known had the aforementioned propensities and character
        traits, including the propensity for theft and to
14      misappropriate individuals personal property for their
        own use and enjoyment and to engage in extortion of
15      money.

16
Dkt. No. 1, 12:3-20.
17
    Clearly, the Fresno Police Department's actions in hiring
18
and supervising the individual defendants, and particularly ex-
19
Det. Kumagai, are relevant.  A municipality may be liable for the
20
acts of its officers if it fails to adequately screen, train or
21
supervise them. *City of Canton v. Harris*, 489 U.S. 377, 388
22
(1989).  Even putative misconduct is relevant, since a material
23
part of a *Monell* claim may properly be failure to discipline or
24
otherwise address this misconduct. *Fiacco v. City of Rensselaer*,
25
783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had
26
any validity, the very assertion of a number of such claims put
27
                                11
28

the city on notice that there was a possibility that its police officers had used excessive force."). Furthermore, although a policy must be demonstrated to satisfy *Monell*, "it is not necessary ... for plaintiffs to prove that a municipality has followed a particular course of action repeatedly in order to establish the existence of a municipal policy; rather, a single action taken by a municipality is sufficient to expose it to liability." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004).

It became clear during the discovery deposition of defendant Sgt. Chastain that the Fresno Police Department was aware of troubling issues pertaining to ex-Det. Kumagai's past, and that those issues remained unresolved during his tenure. Nonetheless, ex-Det. Kumagai was put in a position of trust as a member of the Vice Unit, including in the subject search, where he had unfettered access to large sums of money. It also became evident that Det. Kumagai may have committed more than one instance of serious misconduct around the time of the search and seizure underlying this case, in addition to the admitted misconduct that led to his federal conviction.

Specifically, the following colloquy occurred during Sgt. Chastain's[3] deposition:

---

[3] At all pertinent times, Sgt. Chastain was the supervisor of the Fresno Police Department's Vice Unit and personally did background checks to determine who came into his unit. Chastain Deposition, 5:17-18; 7:11-12; 11:9-13. Accordingly, Sgt. Chastain's allowing ex-Det. Kumagai into the Vice Unit and to work unsupervised can fairly be said to be the decisions of a policymaker. *See Christie v. Iopa*, 176 F.3d 1231, 1236 (9th Cir. 1999) (in determining whether an official is a final policymaker, courts consider whether the official's discretionary decisions are constrained by policies not of that official's making and whether the official's decisions are subject to

12

1

2        Q    All right, before we get into what happened
    and how the searches played out, I wanted to backtrack
3   a little bit and ask you some questions about former
    Detective Kumagai.  Prior to September of 2013, how
4   long had he been under your supervision?

5        A    Less than a year or approximately a year.

6        Q    Okay, when someone comes into vice and
    they're under your supervision, do you make it a point
7   to determine whether or not this is a trustworthy,
    reliable individual?
8

9        A    I do.

10       Q    When you were ascertaining whether Kumagai
    was trustworthy and reliable, did you become aware of
11  any complaints or issues in his performance history
    that concerned you?
12

13       A    Yes.

14       Q    What were those?

15       A    There was a -- there was information that his
    named popped up on a narcotic wire, a marijuana grove
16  wire years before, and I was aware of that, that as a
    result of that, his name coming up, came up on this
17  wire, that he may potentially have involvement in the
    marijuana business or had knew somebody that was
18  involved in it.
19

20            So I reached out, I spoke with the -- who is
    now Sergeant Reynolds, but at the time was a detective
21  in the Vice Intel Unit, who worked that and was aware
    of it.  I also spoke with ex-employees of the
22  department, who have since retired, who was in Vice
    Intel Unit at the time, in doing my background on
23  Derik.

24            I spoke with the ex-supervisor, Darrel Green,
    who was the supervisor in charge of that lead or that
25  tip or that activity that was looked into.  I
    interviewed them all, specifically on that, what was
26

27  _____
    review by authorized policymakers, quoting *City of St. Louis v. Praprotnik*,
28  485 U.S. 112, 127 (1988)).
                              13

1    developed out of that, what came out of it, were we
2    able[4] to confirm or deny the relation with this tip
     that came up.

3         And then in addition to that, I spoke with Derik's
4    current supervisors, the commander, and looked at his
     job performance in the last several years.  What I came
5    to the conclusion of is that none of those
     investigators, sergeants, retired officers who had
6    direct oversight of Derik at that time could say that
     he had anything to do with it.
7

8         The supervisor over it, Sergeant Darrel Green,
     said that they were unable to confirm or deny.  It
9    never came up again.  It was like one bleep on this
     wire out of it.  So I still had questions on it, but
10   Derik had all the appearance of being a great officer
     in the department.  He was on a current sergeant's
11   list, he had interest in moving up in the department,
     he was well respected as a trainer out at the training
12   unit, good communicator.

13
          He had some gaming background and he provided what
14   the unit needed.  He had, like I said, good
     communication skills, he had a little bit of gaming
15   knowledge out of it also, and our oversight of the
     cardroom industry, and he gave a look to the unit that
16   we didn't have, and that was the Asian look.

17
          And there was a whole population of Southeast
18   Asians who were heavily into the underground gaming
     with the Thai lottery and stuff, and Derik had the
19   tools that we could utilize as a unit.  So I brought
     him into it.  We couldn't confirm or deny, couldn't
20   proof anything.

21
          And I personally sat down with Derik, and without
22   disclosing an operation that criminal intelligence had
     on him on days prior to that, I discussed with him how
23   his name may have come up and what was that about.  At
     that time, and this is during the selection process --
24

25        Q    Okay, so this would have been in '12?

26
─────────────────────
27   [4] The context of Sgt. Chastain's answer shows this word was likely erroneously
     transcribed and should read "unable," based on Sgt. Chastain's later
     testimony.
28                                    14

1      A      Yeah.

2      Q      Sorry.

3      A      And Derik assured me that it was -- he had
4   relatives who had been in marijuana, his wife's
    brother-in-law was one of the exclusions he gave me,
5   and he assured me that he had no -- I could trust him
    and that.
6
       And I did, I went on his work record and the
7   recommendation of his current supervisors and
8   commanders and I selected him for the unit.

9      Q      Okay.  During your checking into Detective
    Kumagai, did you learn of any facts indicating that he
10  might have had a gambling problem?

11     A      No.

12     Q      Did you ever become aware of facts suggesting
13  that he had a gambling problem?

14     A      No.

15     Q      After this search in September of 2013,
16  approximately a month later, did you become aware of an
    incident that changed your -- affected your confidence
17  or trust in Detective Kumagai?

18     A      Yes.

19     MR. OSTERBERG:  What was the time period?

20     MR. LITTLE:  About a month after this incident.

21     MR. OSTERBERG:  Incident?

22     MR. LITTLE:  The search.

23     MR. OSTERBERG:  Oh, the search, okay.

24
       BY MR. LITTLE:  Q    What was that?
25

26     A      I believe it was -- and the timeline escapes
27  me, but the one issue that was brought up that turned
                                15
28

1

2        my life around and my opinion of Derik was the --
         when I became aware of a federal investigation.

3
         Q    All right, and that was involving his
4    accepting money from certain known drug dealers?

5        MR. OSTERBERG:  Well, let me object on relevance
     grounds, calls for speculation on the part of  the
6    witness, lacks foundation.  If we can have a running
     objection on these questions.
7

8        MR. LITTLE:  Sure, that's fine.

9        MR. OSTERBERG:  Streamline it.

10       MR. FERGUSON:  Join.

11       MR. OSTERBERG:  Thanks.

12
         BY MR. LITTLE: Q    Okay, was that what you
13   learned, basically, that there was an investigation
     into his financial connection with certain known drug
14   dealers?

15       A    Yes.

16
         Q    Did you also, after this search, become aware
17   that Detective Kumagai and then Detective Cantu had
     acted improperly while they were on a task force
18   operation out of county?

19       MR. FERGUSON:  I'm going to object to that, that
     calls for information that may be protected under the
20   Penal Code, California Evidence Code, not relevant to
     lead to admissible evidence, and it's confidential in
21   how you might even assume such a thing.

22
         It tells me that you may have information,
23   confidential information, for which there might even be
     a privilege order.  And I'm a bit bewildered of how or
24   why you would even ask such a question.

25
         So based on those grounds, I'm going to instruct
26   the witness not to answer the question.

27                            16

28

1          MR. LITTLE:  We have a protective order in place.

2          MR. FERGUSON:  No, we don't have a protective
3   order of the information that you alluded to and that
    bothers me tremendously, how you can even ask such a
4   question, and obviously I'm going to have to get to the
    bottom of it, because it certainly didn't come from
5   this case.

6          MR. LITTLE:  So you're instructing him not –

7          MR. FERGUSON:  I'm instructing him not to answer
8   that question, absolutely.

9          MR. LITTLE:  Okay.

10         MR. FERGUSON:  I have let you go into areas of the
    criminal matter and that's fine, but anything else,
11  it's privileged and I'm instructing him not to answer.

12
           MR. LITTLE:  Okay, well, I'll turn to Detective
13  Cantu, who is also a defendant.

14         MR. FERGUSON:  And the same objection applies as
    to any other specific areas that would be privileged,
15  that would be subject to some previous order by a judge
    that such matters are confidential and shall not be
16  used in any other case, other than some other case
    where something may or may not have come up, and so I'm
17  going to instruct him not to answer as well based on
18  that.

19         Because I don't know why or how you even can infer
    such a thing without implying that it came from some
20  other case that I believe there would have been a
    protective order on it.  So to use it in this case
21  right now may be very well in violation of a court
22  order and I've got to look into it deeper.

23         MR. LITTLE:  Okay, well, I can tell you I don't
    have any information from any other case.  I have never
24  had a case involving Detective Kumagai or Detective
    Cantu.  All I know is rumor and rumors can be true,
25  oftentimes they're not true.

26

27
                              17
28

1

2          MR. FERGUSON:  Well, your rumors, wherever you may
    have heard them, are definitely protected or should
    have been protected by a protective order, and because

3   somebody violated some protective order I'm going to
    not participate in the violation or allow you to

4   participate in the violation of a protective order,
    probably signed by a federal judge, and based on that

5   fact and my knowledge of what I know, I'm going to
    instruct the witness not to respond to those questions.

6

7          And you know better, too, Kevin, you know better.
    You call it a rumor, you know that those rumors are

8   meaningless.  And if some lawyers want to get together
    and some lawyers want to spill you the beans in

9   something or provide you a rumor that's protected by a
    federal protective order, I'm appalled by that.  Not

10  you, but by somebody violating a protective order and
    providing you rumors.

11

12         MR. LITTLE:  To the best of my knowledge, there is
    no lawyer involved in the dissemination of this.

13

14         MR. FERGUSON:  Pardon?

15          MR. LITTLE:  There's no lawyer involved in the
    dissemination of this.

16

17         MR. FERGUSON:  Whatever.  Then it's even worse.

18         MR. OSTERBERG:  Can you tell us where the rumors
    came from?

19
           MR. LITTLE:  From my clients and where they heard
20  it from, I don't know.

21         MR. OSTERBERG:  Well –

22         MR. FERGUSON:  Yeah, well, I'm sticking to my guns
    and I'm instructing the witness not to respond.
23
Deposition of Sgt. Chastain, 11:3-19:1.
24
      Instead of addressing this failure to screen and supervise
25
issue and confronting how they can at the same time withhold
26
pertinent information on the basis of privilege and seek summary
27
                              18
28

judgment, the defendants make a generic and unfocused argument regarding municipal liability.  The defendants cannot rewrite the plaintiffs' claims by focusing on and arguing extraneous issues. *See Rains v. Criterion Sys.*, 80 F.3d 339, 344 (9th Cir. Cal. 1996).  Moreover, it is apparent from comparing the Monell allegations of plaintiffs' complaint (Dkt. No. 1, ¶ 49) with the defendants' summary judgment argument that they fail to address, much less refute, many aspects thereof.

For all of these reasons, summary judgment as to the plaintiffs' Monell claim would be improper. Indeed, as a result of their failure to make cogent arguments and the prior assertion of privilege, the burden has not even shifted under Rule 56 on this issue.

**D.    THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

The defendants' final summary judgment argument is that they are entitled to qualified immunity, even though the evidence most favoring the plaintiff's shows that an intentional theft of well over $100,000 occurred.

In *Saucier v. Katz,* 533 U.S. 194, 204-206 (2001), the United States Supreme Court "established a two-step procedure for determining whether a defendant's conduct was entitled to qualified immunity. First, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Second, if a violation could be shown, was the right violated clearly established? *See Tolan v. Cotton*, 134 S.Ct. 1861, 1865-1866

19

1
2

(2014). The specific context of the case must be considered.

*Saucier v. Katz, supra*, 533 U.S. at p. 201).

3
4
5
6
7
8
9
10
11
12

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stanton v. Sims*, 134 S. Ct. 3, 4–5 (2013) (per curiam). Qualified immunity is unavailable "where the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

13
14
15
16
17
18
19
20
21
22
23
24

The evidence submitted in connection with the motion for summary judgment does not show that the defendants are entitled to summary judgment.  Instead, the evidence shows that a theft occurred, and it has been known essentially since the dawn of civilization that it is wrongful to steal, no matter what the context.  There also are laws prohibiting theft that apply to everyone, including public officials.  *See* Penal Code § 484, et seq.  No reasonable official could have believed it was lawful to take money from a citizen under the guise of public authority, and then not report that money as seized in connection with a search warrant.

25

Accordingly, qualified immunity should be denied.

///

26

20

27
28

1

2          WHEREFORE, the defendants' summary judgment motion should be

3    denied, and this matter should proceed to trial as scheduled.

4

5    Dated:  January 3, 2017          /S/ *Darrell J. York*
                                     Darrell J. York
6                                    Attorney for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                   21

**SUPPORTING DECLARATION OF COUNSEL**

I, Darrell J. York, hereby declare as follows:

1.   I am one of the attorneys of record for plaintiffs.  If called as a witness, I could and would testify competently to each and every fact contained herein.

2.   Attached as Exhibit 1 is a true and correct copy of the Bureau of Gambling Control, Advisory No. 10.

3.   Attached as Exhibit 2 is a true and correct copy of the Plea agreement in the matter of United States v. Derik Kumagai, case number 1:14-cr00061-001.

4.   True and correct copies of the deposition transcripts of the following persons have been lodged with this court pursuant to Eastern District Local Rule 133(j): Derik Kumagai; Micah Jessop; Curt Chastain; Annette Arrellanes; Bob Reynolds; Brittan Ashjian; Paul Zarasua; Ken Dodd; and David Garza.

I declare under penalty of perjury under the laws of the United State and California that the foregoing is true and correct. Executed January 3, 2017, at Santa Clarita, California.

 */s/ Darrell J. York*
Darrell J. York

## DECLARATION OF KRISTINE JESSOP

I, KRISTINE JESSOP, hereby declare as follows:

1.  I am over the age of 18 years of age and not a party to this action.  If I am called as a witness in this matter, I could and would testify competently to each and every fact contained herein.

2.  I am the wife of the plaintiff, Micah Jessop, and was his wife on September 10, 2013.  On that date, officers of the Fresno Police Department came to our home at approximately 9:00 a.m..  I was contacted by a female police officer and she informed me that they had a search warrant for our home.  The officers had me sit in the living room while they searched our home.

3.  Sometime later that morning, Detective Kumagai arrived at our home.  I believe the officers were basically done with the search of our home.  Detective Kumagai showed me a piece of paper and said that it was a receipt for all of the property that they were taking from our home.  He had me sign the paper but I was not able to verify what items were actually being removed from our home.

4.  After Detective Kumagai had me sign the receipt, I saw him walk to the rear of the interior of our home where the bedrooms and bathrooms are located.  I was still seated in the living room when he walked to the rear of our home.  He returned within a few minutes and asked me to show him around the house.  Not knowing why, I accompanied him throughout the house showing him the various rooms of the house.  As soon as we got to the master bedroom, we took two steps into the room, he then asked me if there were any coin machines on the property, as if to lead me

1

1   away from the master bedroom & closet.  I told him

2   that there were some coin machines on the side of the house and

3   he asked me to show him where.  I took him to the side of the

4   house and showed him the coin machines.  Detective Kumagai spoke

5   to some other officers and told them to take the coin machines,

6   they only took two of them and left one coin machine behind that

7   Dectective Kumagai said was not one of them.  We then went back

8   into the house.  I again sat in the living room.

9   5.  As I was sitting in the living room, I saw Detective Kumagai

10   go to the rear of our house to where the bedrooms were located.

11   Detective Kumagai was alone when he went to the rear interior of

12   the house.  He was at the rear area of the home for a several

13   minutes and then he came back out to where I was sitting and said

14   they were done and leaving the house.  Detective Kumagai was the

15   last one to leave my house.

16   6.  Micah arrived home after the officers had left.  I told him

17   about the search of the house.  Micah was concerned about his

18   gold coin & gold certificate collection and asked me if they took

19   the bin containing the coins & certificates.  I told him I did

20   not know.  We then searched the master bedroom & closet where the

21   coin collection was kept and could not locate them.  We then

22   searched the entire house but could not locate the bin, the gold

23   coins, or the gold certificates.  I know the coin collection &

24   the gold certificates were in our home prior to the officers

25   conducting the search and they were missing after they had left.

26   ///

27   ///

28   ///

1  I declare under penalty of perjury under the laws of the United

2  States and the State of California that the foregoing is true and

3  correct.

4  Executed on December 28, 2016, at American Fork, Utah.

5

6  _____

7  Kristine Jessop

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3